PARK LANE MEDICAL CENTER OF KANSAS CITY, INC., Appellant,

v.

BLUE CROSS/BLUE SHIELD OF KANSAS CITY, and Business Men's Assurance Company of America, Respondents.

No. WD 43590.

Missouri Court of Appeals, Western District.

May 21, 1991.

Jeffrey S. Bay and Rick Rehorn, Van Osdol, Magruder, Erickson and Redmond, Kansas City, for appellant.

Max O. Bagby, Bagby & Jacob, Kansas City, for respondent Blue Cross/Blue Shield of Kansas City.

Max W. Foust and James P. Frickleton Foust, Strother & Frickleton, Kansas City, for respondent Business Men's Assur. Co. of America.

Before TURNAGE, P.J., and LOWENSTEIN and BRECKENRIDGE, JJ.

BRECKENRIDGE, Judge.

This is an appeal from the judgment entered on a jury verdict in favor of respondents Blue Cross/Blue Shield of Kansas City and Business Men's Assurance Company of America in an action brought by appellant Park Lane Medical Center of Kansas City, Inc. for recovery under contracts of health insurance. Park Lane Medical Center of Kansas City, Inc. (hereinafter "Park Lane") claims a right to payment under policies of health insurance in Count I as an assignee of the right of payment, and in Count II as a third-party beneficiary of the contracts of insurance. Respondents Blue Cross/Blue Shield of Kansas City (hereinafter "Blue Cross") and Business Men's Assurance Company of America (hereinafter "BMA") refused payment of the claimed expenses. Blue Cross and BMA alleged the expenses claimed were not "covered" expenses within the meaning of the insurance policies because the expenses were those for which the insured was not legally required to pay or alternatively expenses incurred for which free care was provided.

The judgment is affirmed.

The pertinent facts are as follows:

On November 15, 1985, Virginia Williamson, a 55 year old woman in generally good health, went to Park Lane for an outpatient needle biopsy. While intubating Mrs. Williamson for the biopsy, a student at Park Lane put the tube down Mrs. Williamson's esophagus rather than her trachea, thereby depriving her of oxygen. As a result, Mrs. Williamson is in a permanent vegetative state.

Park Lane then treated Mrs. Williamson for an additional 131 days at a cost of $141,190.95. Mrs. Williamson had health insurance with BMA and dependent coverage with Blue Cross through her husband, Mr. James E. Williamson. Mr. Williamson, individually and in his capacity as guardian and conservator for his wife, brought a medical malpractice action against Park Lane and others. The medical malpractice action was subsequently settled.

As part of the malpractice settlement, on September 11, 1986, Mr. Williamson executed a document entitled "Settlement and Release Agreement". The agreement provided, in part:

I have agreed to assist and cooperate with Park Lane Medical Center by signing the appropriate documents or otherwise to procure reimbursement for its bill for Virginia Williamson's subject hospital admission at Park Lane from any health insurance carriers that would have coverage for part or all of such charges. Park Lane Medical Center has agreed to release James E. Williamson from any claim seeking reimbursement for the subject hospital bill seeking to recover only from the health insurance carriers.

Park Lane was not a signator to this document.

Mr. James Williamson also executed on September 11, 1986, a document entitled "Full Release of All Claims of Virginia Williamson, an Incapacitated and Disabled Person, By and Through Her Husband, Guardian and Conservator, James E. Williamson, Made Against Park Lane Medical Center, University of Health Sciences, Joseph M. Yasso, D.O. and Zinnat Meghjee Only and Structured Settlement Agree-

ment". This document was filed with the probate court and provided, in pertinent part:

James E. Williamson, individually and as guardian and conservator of protectee Virginia Williamson has agreed to assist and cooperate with Park Lane Medical Center by signing the appropriate documents or otherwise to procure reimbursement for its bill for Virginia Williamson's subject hospital admission at Park Lane from any health insurance carriers that would have coverage for part or all of any such charges. Park Lane Medical Center has agreed to release James E. Williamson individually and as guardian and conservator of protectee Virginia Williamson from any claim seeking reimbursement for the subject hospital bill seeking to recover only from the health insurance carriers.

Park Lane was not a signator to this document.

Further, on August 30, 1986, and on January 10, 1989, Mr. Williamson executed assignments to Park Lane of all right, title and interest to all benefits and payments due from Blue Cross and BMA for the care and treatment of Virginia Williamson.

In the Williamsons' medical malpractice lawsuit, Park Lane did not file a counterclaim against the Williamsons for the medical care provided Virginia Williamson from November 15, 1985, to March 26, 1986. Park Lane did, however, make demand for payment of the hospital bill on the Williamson's attorney on April 6, 1986, and several times thereafter. Park Lane filed its petition in this case against BMA and Blue Cross on February 21, 1989. Count I was an indemnity action on the insurance policies stating that Park Lane was assigned by Mrs. Williamson's guardian her right to payment under the policies. Count II alleged breach of contract, asserting that Park Lane was a third party beneficiary of Mrs. Williamson's policy with BMA and her dependent policy with Blue Cross.

Prior to trial, Park Lane filed a Motion in Limine which sought to exclude: (1) extrinsic and parol evidence regarding the intent of the parties to the above mentioned set-tlement agreements stating that the agreements were unambiguous as a matter of law, and (2) evidence of Park Lane's alleged negligence because such evidence was both irrelevant and highly prejudicial to Park Lane. The motion was overruled.

Plaintiff Park Lane's Motion for Summary Judgment on the issue of liability was denied and the matter tried. At trial, Park Lane injected the first evidence of "intent" by calling witnesses James Johnson, hospital administrator for Park Lane, William A. Lynch, counsel for Park Lane in the malpractice case and the drafter of the settlement documents, and Michael J. Paulson, Park Lane's director of quality assurance and risk management. Over the objection of BMA, Park Lane elicited testimony of the intent of Park Lane in negotiating the settlement and in drafting the settlement documents signed by James Williamson.

At trial, evidence was also adduced regarding discussions concerning the cost of Mrs. Williamson's inpatient care and treatment and the cost of an additional hospital room where the Williamson family stayed. James Johnson testified to a conversation with Mr. Williamson about these costs which occurred within several days of the incident as follows:

Q. (By Mr. Bay) Would you please tell us what the subject matter of your conversations with Mr. Williamson was?

A. It was about several things. One, what had happened to his wife at the hospital. Secondly, he was concerned about the bill. I don't remember exactly what I said to Mr. Williamson but I do recall feeling at the time, trying to tell him not to worry about it. This is several days after the incident and Mr. Williamson and the family were still very upset, obviously, and it was my feeling that—well, I just tried to get him not to worry about the bill.

Q. The financial matters?

A. Yes.

Mr. Williamson's testimony concerning this same conversation is as follows:

Q. I want you to tell this jury what Jim Johnson, the administrator of the hospital said to you and your sons about the charges for Virginia and charges for you staying there?

A. Yeah. Well, I became kind of concerned, you know, whether I would be billed for staying there, so my boys and myself went to his office and asked him if I would stay there courtesy of the hospital and he said the hospital was taking care of everything.

Q. Including Virginia?

A. Well, he just said the hospital is taking care of everything. That's what he said.

Q. All right. And how did you interpret that when Jim Johnson said to you and your sons, the hospital is taking care of everything?

A. Well, I figured that they were taking care of our stay there and also my wife's stay there. That is what I figured.

In addition, upon learning of the malpractice that caused his wife's vegetative condition, Mr. Williamson instructed his attorney to advise BMA that Mr. Williamson did not want BMA to pay Virginia's bills because he "didn't think they should be paid for messing up [his] wife".

A jury returned a verdict for defendants BMA and Blue Cross. Park Lane's post-trial motions for judgment notwithstanding the verdict and new trial were denied. This timely appeal followed.

Park Lane appeals alleging trial court error in allowing evidence other than the settlement agreements regarding the intent of the parties in that the settlement agreements are clear and unambiguous as a matter of law. Secondly, Park Lane contends that the evidence of negligence on the part of Park Lane in the underlying malpractice claim should have been excluded in that the evidence was irrelevant and highly prejudicial.

■ The primary issue is whether Virginia Williamson's medical expenses are "covered" expenses within the meaning of the defendants' insurance policies. "[M]edical and hospital expense insurance is not insurance in the usual sense, providing benefits upon the occurrence of an event. It is by definition a contract of indemnity ... intended to indemnify and hold the insured harmless from obligations he is by law compelled to pay." *Bloebaum v. Gen. American Life Ins. Co.*, 734 S.W.2d 539, 540 (Mo.App.1987) (citations omitted). Since Park Lane's claim for insurance benefits is as an assignee or third-party beneficiary, it can claim no greater right under the contracts than that of the insureds, James and Virginia Williamson.

Blue Cross and BMA's insurance contracts contain nearly identical provisions concerning what are "covered" expenses to those recited in *Bloebaum, supra*. The pertinent provision in the case at bar reads:

Covered Expenses do *not* include:

12. Expenses for medical care, services or supplies which are paid directly or indirectly by a national, state or local government, or any agency thereof, or *for which payment by the individual or dependent is not legally required in the absence of insurance, or expenses incurred for which free care is provided* ... (emphasis added).

Covered expenses, therefore, would not include expenses for which the insured has been released from liability of payment or which were provided as free care. See *Margolis v. Prudential Ins. Co. of America*, 629 F.Supp. 195 (D.D.C.1985). In *Bloebaum*, 734 S.W.2d at 541, the court determined that one cannot be indemnified for a loss one did not sustain.

In determining whether Park Lane intended to release the Williamsons from all liability for the medical expenses, thereby causing the expenses to be those for which payment by the insured is not legally required, the trial court looked to the settlement agreements in the malpractice case.

■ In Missouri, the general rules of contract construction apply when interpreting settlement agreements. *Press Machinery Corp. v. Smith R.P.M. Corp.*, 727 F.2d 781, 784 (8th Cir.1984). The cardinal rule in interpreting a contract is to ascertain the intention of the parties and give effect to

that intention. Where no ambiguity in the contract exists, the intent of the parties is to be garnered from the contract, and it becomes the duty of the court and not the jury to state its clear meaning. *Edgewater Health Care v. Health Systems*, 752 S.W.2d 860, 865 (Mo.App.1988). The construction and interpretation of a written contract is a matter of law, not fact. As such, it is the trial court's duty as a matter of law to determine if a contract is ambiguous in its meaning. This court has the obligation to determine whether the trial court has erroneously interpreted the contract in finding the contract to be ambiguous as a matter of law. *Anchor Centre Partners v. Mercantile Bank*, 803 S.W.2d 23, 32 (Mo. banc 1991); *Eatherton v. Moore*, 636 S.W.2d 349, 350 (Mo.App.1982). Thus, this court reviews the contract itself to determine if any ambiguity exists. Once it is determined as a matter of law that an ambiguity does exist, then it is for the jury to resolve that ambiguity, *Edgewater*, 752 S.W.2d at 865. To aid the jury in resolving the matter, it is proper for the trial court to allow evidence of the intent of the parties. *O'Brien v. Missouri Cities Water Co.*, 574 S.W.2d 13, 19 (Mo.App.1978).

Park Lane argues that the settlement documents were not ambiguous as to the parties' intent and were, as a matter of law, an assignment by the Williamsons of their insurance benefits and a covenant by Park Lane not to sue the Williamsons for the medical expenses incurred. Blue Cross and BMA also argue that the settlement documents were not ambiguous, but they argue the documents were a release by Park Lane of the Williamsons' liability for the medical bills.

Here, the trial court found the language from the settlement documents to be ambiguous. This court agrees. Turning to the language of the settlement documents quoted, *supra*, it is clear that ambiguities exist. While the term "release" was used, other language suggests a covenant not to sue was intended. Further, from a full reading of the settlement documents, it appears they were written primarily as a recital of the duties and obligations of the Williamsons, rather than Park Lane. This is further emphasized by the fact that the documents were not drafted to require execution by Park Lane. The trial court, therefore, was correct in allowing the jury to consider parol evidence of the intent of the parties with regard to releasing the Williamsons and, consequently, BMA and Blue Cross from liability for payment of the hospital bill.

■ In addition, Park Lane's position at trial clearly was contrary to its position in its Motion In Limine and in this appeal. Park Lane's first three witnesses in its case in chief testified as to "intent". In response to BMA's objection, counsel for Park Lane argued "[t]his whole case's intent—this whole case is intent.... [My question] goes to the state of mind of Park Lane and whether or not they meant, intended or said there will be no liability, responsibility for the charge." A party must make a timely objection at trial to the evidence sought to be excluded by a Motion In Limine. *Peters v. Henshaw*, 640 S.W.2d 197, 201 (Mo.App.1982). Here, not only did Park Lane not object to extrinsic evidence proffered by the defendants, it was the first to offer extrinsic evidence of intent. Park Lane cannot complain on appeal that allowing extrinsic or parol evidence is error after introducing such evidence at trial. *Frye v. Meramec Marina, Inc.*, 673 S.W.2d 451, 454 (Mo.App.1984).

■ This court now considers the trial court's ruling which allowed evidence of Park Lane's alleged malpractice. The decision to admit or exclude evidence rests within the broad discretion of the trial court. *Karashin v. Haggard Hauling & Rigging, Inc.*, 653 S.W.2d 203, 205 (Mo. banc 1983). A trial court may and should exclude evidence when the probative value is slight and the potential for prejudice great. *Barr v. Plastic Surgery Consultants, Ltd.*, 760 S.W.2d 585, 587–88 (Mo. App.1988); *see also Conley v. Kaney*, 250 S.W.2d 350 (Mo.1952). Park Lane's alleged negligence was relevant to the issue of whether Park Lane intended to release the Williamsons from any personal liability for Mrs. Williamson's hospital stay. *See Bloe-*

*baum,* 734 S.W.2d at 541 *citing Margolis,* 629 F.Supp. at 199. Here, the trial court did not abuse its discretion in allowing evidence of alleged negligence by Park Lane. Evidence regarding the underlying malpractice was essential in determining whether Park Lane intended to release the Williamsons from all liability for the bill. Any prejudicial effect of such evidence was not sufficient to warrant exclusion in light of its probative value.

The judgment of the trial court is in all respects affirmed.

All concur.