5 F.Supp.2d 720 (1998)
PRINCIPAL MUTUAL LIFE INS. CO., Plaintiff,
v.
Elaine S. KARNEY, et al., Defendants.
No. 4:96CV1999SNL.
United States District Court, E.D. Missouri, Eastern Division.
May 8, 1998.
*721 *722 Richard J. Pautler, Thompson Coburn, St. Louis, MO, for Principal Mut. Life Ins. Co.
Michael Armin Wolff, Charles A. Seigel, III, Seigel and Wolff, P.C., St. Louis, MO, for Stacey Wohl.
Steven M. Hamburg, Michael W. Newport, Summers and Compton, St. Louis, MO, for Andrea Lyn Wohl, Leroy Kopolow and Robert J. Wohl.
Stuart L. Oelbaum, of counsel, Steven M. Hamburg, Michael W. Newport, Summers and Compton, St. Louis, MO, for James Sherby, and Andrea Lyn Wohl.
Stuart L. Oelbaum, of counsel, Nichols and Challis, Richard S. Bender, Rosenblum and Goldenhersh, St. Louis, MO, for Melissa Wohl.

MEMORANDUM
LIMBAUGH, District Judge.
Plaintiff insurer brought this interpleader action for resolution of conflicting claims to the proceeds of a life insurance policy on decedent Mark Wohl. On October 14, 1997 the Court discharged plaintiff Principal Mutual from this case pursuant to a stipulated Consent Order and Judgment (# 64). The adverse parties presently before this Court are: 1) Elaine Wohl Karney  former (first) wife of decedent Mark Wohl; 2) Andrea Wohl  younger of the two (2) daughters born of the marriage of Elaine Wohl Karney and Mark Wohl; 3) Stacey Wohl  older of the two (2) daughters born of the marriage of Elaine Wohl Karney and Mark Wohl; 4) Robert Wohl  decedent Mark Wohl's father; 5) Leroy Kopolow  an insurance representative and co-trustee of alleged insurance trust; and 6) Melissa Anne Wohl  third wife and present widow of decedent Mark Wohl.[1]
*723 Presently pending before the Court are cross-motions for summary judgment filed by all of the adverse parties. On July 7, 1997 defendants Andrea Wohl, Robert Wohl, and Leroy Kopolow filed for summary judgment contending that a property settlement agreement (or commonly referred to as a separation agreement) entered into by decedent and Elaine Wohl Karney, and incorporated into the final decree of divorce, constituted an equitable assignment of the policy to Andrea Wohl, and furthermore, gave her a vested interest in the subject life insurance policy. They further argue that such a vested interest could not be divested by decedent's subsequent attempt to change the beneficiary on the subject policy to his widow, Melissa Anne Wohl. These defendants seek to have a constructive trust imposed on the full amount of the insurance policy's proceeds, plus accrued interest, on behalf of defendant Andrea Wohl. See, Court pleading # 39, filed July 7, 1997. Defendant Melissa Anne Wohl filed a counter motion for summary judgment contending that she is entitled to the full amount of the insurance policy's proceeds (plus interest accrued) as the last named beneficiary on the policy. She further contends that any obligation that decedent Mark Wohl had to financially provide for Andrea and Stacey Wohl has been fulfilled by the creation of a "Children's Trust" in 1991. She furthermore contends that the statute of limitations has run on the other defendants' attempt to enforce the separation agreement allegedly regarding the subject insurance policy. Finally, she contends that if the Court should enforce the separation agreement as it regards the distribution of the proceeds of the subject insurance policy, defendants Andrea Wohl and Stacey Wohl are only entitled to $100,000.00, with the remainder of the proceeds to go to her.[2]See, Court pleading # 51, filed July 31, 1997. On September 9, 1997 defendant Stacey Wohl filed her separate motion for summary judgment. She essentially adopts her sister's motion, except she requests that a constructive trust be imposed on behalf of both she and her sister Andrea. See, Court pleading # 62, filed September 9, 1997.
The case was set for trial on the Court's non-jury trial docket of November 24, 1997. On November 7, 1997 the Court inquired of counsel as to whether this matter could be resolved by ruling on the instant summary judgment motions without the necessity of trial testimony. See, Court correspondence # 66. All counsel responded that this case could be resolved solely on the basis of the dispositive motions without the necessity of trial testimony. See, Court documents # 67, # 68, and # 69. This case was removed from the Court's non-jury trial docket and, thus, stands ripe for final disposition on the basis of the defendants' summary judgment motions.
Courts have repeatedly recognized that summary judgment is a harsh remedy that should be granted only when the moving party has established his right to judgment with such clarity as not to give rise to controversy. New England Mut. Life Ins. Co. v. Null, 554 F.2d 896, 901 (8th Cir.1977). Summary judgment motions, however, "can be a tool of great utility in removing factually insubstantial cases from crowded dockets, freeing courts' trial time for those that really do raise genuine issues of material fact." Mt. Pleasant v. Associated Elec. Coop. Inc., 838 F.2d 268, 273 (8th Cir.1988).
Pursuant to Fed.R.Civ.P. 56(c), a district court may grant a motion for summary judgment if all of the information before the court demonstrates that "there is no genuine issue as to material fact and the moving party is entitled to judgment as a matter of law." Poller v. Columbia Broadcasting System, Inc., 368 U.S. 464, 467, 82 S.Ct. 486, 7 *724 L.Ed.2d 458 (1962). The burden is on the moving party. Mt. Pleasant, 838 F.2d at 273. After the moving party discharges this burden, the nonmoving party must do more than show that there is some doubt as to the facts. Matsushita Elec. Industrial Co. v. Zenith Radio Corp., 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). Instead, the nonmoving party bears the burden of setting forth specific facts showing that there is sufficient evidence in its favor to allow a jury to return a verdict for it. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); Celotex Corp. v. Catrett, 477 U.S. 317, 324, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).
In passing on a motion for summary judgment, the court must review the facts in a light most favorable to the party opposing the motion and give that party the benefit of any inferences that logically can be drawn from those facts. Buller v. Buechler, 706 F.2d 844, 846 (8th Cir.1983). The court is required to resolve all conflicts of evidence in favor of the nonmoving party. Robert Johnson Grain Co. v. Chem. Interchange Co., 541 F.2d 207, 210 (8th Cir.1976). With these principles in mind, the Court turns to an examination of the facts.
Decedent Mark Wohl married defendant Elaine Wohl Karney (hereinafter referred to as simply "Elaine") on June 13, 1971. Two daughters were born of this marriage: defendant Stacey Wohl (Stacey), born June 10, 1975, and defendant Andrea Wohl (Andrea), born May 21, 1977.
On January 4, 1982 decedent and Elaine were divorced. Their divorce decree specifically incorporated the terms of their "separation agreement". Article II, Paragraph 5 of the separation agreement[3] states:
"Respondent [Mark Wohl] agrees that until each said children [Stacey Wohl and Andrea Wohl] attains the age of twenty-one (21) years, he shall maintain in full force and effect an insurance trust which has been created naming the children the beneficiaries of not less than One Hundred Thousand Dollars ($100,000.00) face value of the proceeds and designating Robert J. Wohl and Leroy Koplow [sic] as co-trustees of said insurance trust."
At the time of the divorce, a $100,000.00 life insurance policy had been issued by Bankers Life Co. (now known as the interpleader plaintiff Principal Mutual Life Ins. Co.) on decedent Mark Wohl to Mark's employer, Premium Associates.[4] The founder and (then) majority shareholder of Premium Associates was Mark's father, defendant Robert Wohl (Robert). This policy, Policy # 2795695, had been sold to Premium Associates in 1975 by defendant Leroy Kopolow.[5] The original beneficiaries of this policy were Premium Associates (for the reimbursement of all premiums paid) and Elaine (for the remainder value of the policy).
In 1984, Mark married Pamela Wohl and two (2) additional children were born of this marriage (Ashley and Molly). Mark and Pamela were divorced on May 6, 1993.
In 1994, Mark married defendant Melissa Anne Wohl (Melissa). No children were born of this marriage. On August 1, 1996 Mark died of cancer. At the time of his death, he was still married to Melissa.
After Mark's divorce from Elaine, and while he was married to Pamela, Premium Associates took out another life insurance policy on Mark. In October 1987, Premium Associates acquired a $750,000.00 life insurance policy on Mark from General American Life Ins. Co. (the General American policy). *725 The named trustee and sole beneficiary of the policy was Premium Associates Defined Benefit Plan (the Plan).
In July 1991, Mark created a "Revocable Living Trust" (hereinafter simply referred to as the RLT) naming himself the trustee. As a separate provision of this RLT, Mark created the "Children's Trust Share" which provided pro-rata benefits to defendants Stacey and Andrea, as well as his two daughters by Pamela, upon each of the children reaching certain ages. This "Children's Trust Share" was amended three (3) times, the last time being shortly before his death.[6] None of the amendments named defendants Robert Wohl and/or Leroy Kopolow as trustees. All the amendments provided, that in the event of the death of any one of his four daughters without descendents prior to distribution, that the decedent daughter's share would lapse and be prorated among the surviving siblings.
Although it is unclear, it appears that when the RLT was originally created, it was named the "beneficiary" of the Principal policy. In 1995, when the RLT was amended for the second time, Mark directed that the Childrens' Trust Share be funded by the General American policy in total, and he executed a change of beneficiary form designating the new beneficiary to be the RLT. Finally, in 1996, when Mark amended the RLT for the third time, he directed that the Childrens' Trust Share be funded by the General American policy in the amount of $600,000.00 only; with the remainder value of the policy to go to defendant Melissa Anne Wohl.
Meanwhile, on June 1, 1994, shortly after marrying Melissa, Mark executed a change of beneficiary form for the Principal policy. He named Melissa as the new beneficiary of the Principal policy. Defendants A. Wohl, R. Wohl, and L. Kopolow's Exhibit J.
On August 1, 1996 Mark Wohl died. Shortly thereafter, interpleader plaintiff Principal Mutual Life Ins. Co. received competing claims for the proceeds of the subject Principal policy. Defendant Elaine Wohl Karney submitted a claim on behalf of her daughter Andrea. She believed that Andrea was entitled to the insurance proceeds pursuant to Article II, Paragraph 5 of the settlement agreement since she (and not defendant Stacey Wohl) was not twenty-one (21) years old at the time of Mark's death. Defendant Melissa Anne Wohl submitted a claim as the last "formally" designated beneficiary on the subject policy.
The first issue to be addressed by the Court is whether the applicable statute of limitations has run on defendant Andrea Wohl's claim for the insurance proceeds.[7] After careful consideration of the matter, the Court determines that Andrea's claim (as well as her sister Stacey's claim) is timely.
Defendant Melissa Anne Wohl contends that the sisters' claims are untimely because they have waited too long to "revive" their parents' divorce decree and settlement agreement. She specifically argues that Missouri statute of limitations § 516.350 is applicable, and that the ten (10) years limitation period expired in 1992, ten (10) years after Mark and Elaine entered into their settlement agreement and it was incorporated into their divorce decree. In support of her argument she cites two (2) Missouri cases: Pirtle v. Cook, 956 S.W.2d 235 (Mo.1997) and Ronollo v. Ronollo, 936 S.W.2d 188 (Mo.App. 1996). Andrea and Stacey argue that whether or not § 516.350 R.S.Mo. is applicable, pursuant to § 516.100 R.S.Mo., the limitations period did not commence running until Mark died. They cite the Missouri case of Remmele v. Remmele, 853 S.W.2d 476 (Mo. App.1993) in support of their position.
Melissa's argument is that Elaine and/or her daughters had ten (10) years from the date of the divorce within which to enforce *726 Paragraph 5, and having not done so, are now barred pursuant to § 516.350 R.S.Mo. Section 516.350 reads, in pertinent part:
1. Every judgment, order or decree of any court of record in the United States, or of this or any state, territory or country, except for any judgment, order, or decree awarding child support or maintenance which mandates the making of payments over a period of time, shall be presumed to be paid and satisfied after the expiration of ten years from the date of the original rendition thereof ... and no execution, order or process shall issue thereon, nor shall any suit be brought, had or maintained thereon for any purpose whatever.
Having considered Melissa's argument, the Court determines that such is meritless. The logical extension of Melissa's argument is that divorced persons would have to go to court no more than every ten (10) years to "revive" their divorce decree; otherwise, their divorce decree would be nullified. Furthermore, the cases cited by Melissa, although grounded in divorce actions, are clearly distinguishable from the case at hand.
In Pirtle, supra, the former wife sought to revive her 1984 divorce decree in which her former husband was ordered to pay her the minimum sum of $40,000.00. This sum was to be paid out from the sale of certain marital property, with the wife guaranteed not less than $40,000.00 and any additional sum that would result in a net to her of 65% of such sale net proceeds. If the real estate sale did not net the former wife the minimum $40,000.00, then the former husband was obligated to make up the amount or difference from other assets owned by the former husband. Pirtle, at 237. Ultimately, the subject property did not sell, and the lender foreclosed. The parties received no proceeds from the foreclosure sale, and the former husband did not pay the plaintiff wife her $40,000.00. Pirtle, at 238. In 1994, the former wife attempted to revive their 1984 property settlement agreement ordering the former husband to pay her $40,000.00.
The Missouri Supreme Court held that § 516.350.1 was applicable because "[i]n the instant case, the statute of limitations is that governing actions to enforce a court's money judgment." Pirtle, at 244-45. The Court specifically found that
"[b]ecause the dissolution decree that wife attempted to revive was originally rendered on September 10, 1984, the ten year limitation period of section 516.350.1 commenced to run on that date. Sec. 516.350.1. Wife never recorded a payment on the judgment debt. Wife did not file a motion to revive until more than ten years after the judgment was originally rendered. Consequently, the statute plainly dictates that the judgment is conclusively presumed to be paid and no suit can be maintained. Id."
Pirtle, at 244.
In Ronollo, supra, the former wife's attorney brought a motion for contempt and execution against the former spouses for failure to pay attorney's fees incurred in the divorce action fourteen years earlier. In the dissolution decree, the court had found that the plaintiff attorney was entitled to a reasonable attorney's fee of $5000.00. The former husband had already paid a portion of the fee; and the dissolution decree provided that the former wife was to pay the balance (plus costs) out of her share of the proceeds from the sale of the marital residence. Ronollo, at 189. The property was never sold, the plaintiff attorney never forced the sale, and the plaintiff attorney never sought to revive the judgment for his fee within ten (10) years after entry of the dissolution decree. Fourteen (14) years later, the plaintiff attorney filed an action seeking payment of his fee. Ronollo, at 189.
The Ronollo Court found that the presumption of payment in § 516.350.1 R.S.Mo. applied, and that since the plaintiff attorney had not revived his money judgment within ten (10) years of its entry, he was now foreclosed from bringing any type of action to collect or enforce it. Id., at 190.
Both of these cases were cases clearly involving a money judgment or judgment debt of a sum certain. Within the divorce decrees, a money judgment of a sum certain had been awarded to a party (or in the case of Ronollo, an attorney for services rendered). At the time of the entry of the *727 divorce decrees, a judgment of money damages or fees was clearly denoted; i.e. the interested party received a judgment entitling him or her to a sum of money ascertainable as of the date of the original entry of the judgment. This is not the situation existing in the instant case. Here no money judgment for a sum certain was awarded via Paragraph 5 of the settlement agreement. All Paragraph 5 did was to obligate Mark to maintain a certain amount of life insurance on himself to benefit Andrea and Stacey, a benefit which was not capable of ascertainment until his death. "The ten year limitation period in section 516.350.1 begins to run upon the original rendition of a judgment, not upon a wrong, breach of contract, or breach of duty." Pirtle, at 245.
This Court finds Remmele, supra, to be authoritative in the instant case. In Remmele, the decedent husband had entered into a separation agreement with his former wife. The agreement required him to execute an irrevocable will naming his three (3) children as the sole equal beneficiaries of his estate. Id., at 478. The parents were divorced on December 14, 1972; the divorce decree incorporated into it the separation agreement. In January 1990, decedent died leaving a will which did not name his three (3) children as the sole equal beneficiaries of his estate. Id., at 478.
The children who received less than equal shares from their deceased father's estate brought suit against the estate as third-party beneficiaries to their parents' separation agreement and dissolution decree, seeking enforcement of the provision of the separation agreement which directed the decedent to execute a will distributing his estate equally among his children. The children plaintiffs filed their lawsuit in March 1990, approximately three (3) months after their father's death. The Missouri Court of Appeals held that the five (5) year statute of limitations for breach of contract claim, § 516.120, was applicable; and furthermore, pursuant to § 516.100 did not commence running until the father's death. Id., at 478-481.
Missouri statute of limitations § 516.100 states, in pertinent part:
for purposes of section 516.100 to 516.370, the cause of action shall not be deemed to accrue when the wrong is done or the technical breach of contract or duty occurs, but when the damage resulting therefrom is sustained and is capable of ascertainment, and if more than one item of damage, then the last item, so that all resulting damage may be recovered, and full and complete relief obtained.
§ 516.100 R.S.Mo. (1986).
The Court found that the parents had entered into a bilateral contract. The former wife exchanged her promise to sign the separation agreement for the former husband's promise to leave one-third of his estate to each of their three (3) children. Id., at 478-79. Consequently, the statute of limitations for contract actions, § 516.120 R.S.Mo., was applicable. Id., at 479. The Court further found that the former husband's failure to execute a will simultaneously with the separation agreement was only a "technical breach" of his primary required performance, which was to ultimately leave one-third of his estate to each of his three (3) children. The Court reasoned that although the plaintiffs could have sued on the "technical breach" in 1972, the real breach did not occur until the former husband died leaving a will that did not comport with the requirements of the separation agreement, and it was at that time that the plaintiff children sustained their damages. Id., at 479-80. Thus, pursuant to § 516.100 R.S.Mo., the plaintiff children's cause of action did not arise until the death of their father. Id., at 480.
In the instant case, this Court finds that Elaine and Mark entered into a bilateral contract under which one of Mark's obligations was to create or maintain an "insurance trust", with a minimum value of $100,000.00, for the benefit of his daughters Stacey and Andrea.[8] The settlement agreement *728 fails to set a deadline for the creation or maintainence of this "insurance trust"; however, it clearly provides for a minimum of $100,000.00 in life insurance benefits for Stacey and Andrea upon Mark's death. Unlike the plaintiffs in Pirtle and Ronollo, Stacey and Andrea did not have an immediate right to a sum certain of damages. Up until the time of their father's death, the only claim that existed was to force Mark to create an actual document comporting with the specifics of Paragraph 5. Mark's failure to do so was a technical breach of his commitment, which fails to commence the running of the limitations period. Damages were neither sustained nor capable of ascertainment, as required under § 516.100 R.S.Mo., until Mark died. The subject life insurance policy, or even an "insurance trust" (had one been actually created) would not have a final redeemable value to Stacey and Andrea until Mark died. Its value would continue to increase over the years until Mark's death. Furthermore, assuming an actual trust had been created, Mark could have funded it with different policies of differing amounts up until his death (as long as he complied with the conditions and terms as set forth in Paragraph 5). Consequently, Andrea and Stacey's damages, for Mark's alleged substantive breach of the settlement agreement, were not "capable of ascertainment" until his death. "Under the capable-of-ascertainment test set forth in section 516.100, a cause of action accrues when `the injury to plaintiff was complete as a legal injury'. The damage must be actually sustained and capable of ascertainment before the right to sue arises and the statute of limitations period begins to run." Nettles v. American Telephone and Telegraph Co., 55 F.3d 1358, 1362-63 (8th Cir. 1995) (citations omitted). Therefore, Andrea and Stacey's cause of action did not arise until Mark's death when it was determined that Mark had allegedly failed to comply with the terms and conditions of the settlement agreement, and not at the date of the signing of the settlement agreement by Mark and Elaine. In 1982, the damages had not been sustained or were capable of ascertainment. Andrea and Stacey's claim(s) are timely.
Having found Andrea and Stacey's claims to be timely, the substantive crux of this dispute is two-fold: 1) whether the Principal policy or the Children's Trust Share satisfied Mark's obligations under the 1982 settlement agreement and divorce decree; and 2) (assuming arguendo that the Principal policy was intended to satisfy Mark's obligations under the settlement agreement and divorce decree) whether Mark's right to change the beneficiary on the Principal policy was "superior" to the vested rights that Andrea and Stacey had in the proceeds of the Principal policy.
Melissa argues that the Children's Trust Share created in 1991 satisfied Mark's obligations pursuant to Article II, Paragraph 5 of the settlement agreement. Andrea argues that the Principal policy was intended to satisfy Mark's obligations pursuant to Article II, paragraph 5 of the settlement agreement. After careful consideration of the matter, the Court finds that the Principal policy was intended to satisfy Mark's obligations pursuant to Article II, Paragraph 5 of the settlement agreement.
In Missouri, a settlement agreement is considered to be a contract and subject to the general rules of contract construction of the forum state. Press Machinery Corp. v. Smith R.P.M. Corp., 727 F.2d 781, 784 (8th Cir.1984); Park Lane Medical Center of Kansas City, Inc. v. Blue Cross/Blue Shield of Kansas City, 809 S.W.2d 721, 724-25 (Mo.App.1991); Blackman v. Blackman, 767 S.W.2d 54, 59 (Mo.App.1989). The primary rule of contract construction is that the intention of the parties shall govern. Press Machinery, at 784; Andes v. Albano, 853 S.W.2d 936, 941 (Mo.1993); Park Lane, at 724-25; Blackman, at 59. Although the construction and interpretation of a contract is a question of law; the intent of the parties is a question of fact. If the court determines *729 that there is no ambiguity, then the intent of the parties must be determined solely from the four corners of the document. However, if the court determines that an ambiguity does exist, then evidence of the intent of the parties must be considered. Press Machinery, supra.; Park Lane, supra.; Blackman, supra.
In determining whether a contract or any provision therein is ambiguous, the court must consider the whole instrument and the plain and ordinary meaning of the language. Press Machinery, at 784. A mere difference of opinion as to the proper interpretation of the contract does not render the contract ambiguous as a matter of law. Id. The test is whether the disputed language, in the context of the entire agreement, is reasonably susceptible of more than one construction giving the words their plain and ordinary meaning as understood by a reasonable, average person. Blackman, at 59 citing Enyeart v. Shelter Mut. Ins., 693 S.W.2d 120, 123 (Mo.App.1985). The court is to determine the intention manifested not by what the parties now say they intended, but by the document. Press Machinery, at 784; Blackman, at 59.
As stated before, if the court determines that an ambiguity exists, the use of extrinsic evidence for interpretation is proper. Press Machinery, at 784. "It is elementary that where the words of a contract create an ambiguity then, in order to ascertain the intentions of the parties, resort must be had to the circumstances surrounding the formulation and execution of the contract, the relationship of the parties, the purpose to be served, the course of negotiations if any." Prudential Insurance Co. of America v. Gibson, 421 S.W.2d 26, 31 (Mo.App.1967); General American Life Ins. Co. v. Rogers, 539 S.W.2d 693, 698 (Mo.App.1976); see also, Glover v. Metropolitan Life Ins. Co., 499 F.Supp. 1308, 1314 (E.D.Mo.1980), aff'd. in part and rev'd in part (on other grounds), Glover v. Metropolitan Life Ins. Co., 664 F.2d 1101 (8th Cir.1981). One Missouri court has found that "[o]n the question of competent evidence, we note that the appellant [executor of decedent's estate seeking to recover insurance proceeds paid out to decedent's former wife] cannot introduce testimony relating decedent's prior statements with respect to his belief as to the meaning of the stipulation agreement." Bell v. Garcia, 639 S.W.2d 185, 192 (Mo.App.1982).[9]
The disputed language in Paragraph 5 is ambiguous as to the nature of this "insurance trust". Although it specifically names Andrea and Stacey as the beneficiaries, and Robert Wohl and Leroy Kopolow as co-trustees, it fails to identify the insurance policies funding this "insurance trust". It is unclear as to whether the clause is referring to then-existing policies which would be affirmatively placed in trust for the benefit of Andrea and Stacey or the term "insurance trust" is simply legalese for Mark's obligation to maintain life insurance on himself for the benefit of Andrea and Stacey. Adding to the confusion is the fact that the clause refers to an "insurance trust which has been created"; language implying that at the time of the drafting of the settlement agreement, an "insurance trust" was already in existence. Yet, the undisputed fact is that at the time of the drafting of the settlement agreement, no instrument denoted as an insurance trust existed naming Andrea and Stacey as beneficiaries nor Robert Wohl and Leroy Kopolow as co-trustees.
Having found that Paragraph 5 is ambiguous as to the nature of the "insurance trust", *730 the Court finds it necessary to consider extrinsic evidence in order to ascertain the intentions of Mark and Elaine with respect to Paragraph 5.
At the time of the divorce, there was only one (1) insurance policy with a face value of at least $100,000.00 in effect: the Principal policy insuring Mark. Gerald Fitzgerald, Mark's insurance agent at the time of the divorce, testified that he discussed with Mark using the Principal policy[10] to fund Mark's obligations under the settlement agreement and divorce decree. Deposition of Gerald Fitzgerald, pgs. 12 and 56. Robert Wohl has testified that conversations with Mark and Mr. Fitzgerald (as well as with Leroy Kopolow) took place in which use of the Principal policy to fund Mark's obligations were discussed and agreed upon. Deposition of Robert Wohl, pgs. 9-10, 17. Robert Wohl has further attested to the fact that as the owner of the Principal policy, he agreed to the assignment of the Principal policy to fund Mark's obligations under the Settlement Agreement. Affidavit of Robert Wohl, Defendants Wohl, Wohl, and Kopolow's Exhibit D. Elaine Wohl Karney has testified that at the time of the divorce she was aware of only two insurance policies in effect: a $100,000.00 policy on Mark and a $5000.00 policy on herself. She further testified that at the time she signed the settlement agreement, she believed that the insurance referred to in Paragraph 5 was the Principal (f/k/a Bankers) policy and that Andrea and Stacey were the beneficiaries of the policy. Deposition of Elaine Wohl Karney, pgs. 11-12, 18-19, 36-37, 40. Pamela Wohl, Mark's second wife, has testified that she had discussions with Mark with respect to a Principal/Bankers policy satisfying Mark's obligations under the settlement agreement and divorce decree entered in Mark and Elaine's divorce. Deposition of Pamela Wohl, pgs. 5, 14-15. Finally, Mark's sister Carol Berkin, attests that in 1995 Mark reviewed his insurance policies with her.[11] She attests that Mark stated that the policy issued by Bankers' Life Ins. Co. (now known as Principal) was to benefit his children with Elaine in the event of his death. Affidavit of Carol Berkin.
Melissa contends that the "insurance trust" referenced in the settlement agreement is the Children's Trust Share created as part of the RLT. She concedes that she never had any conversation with Mark as to the Children's Trust Share satisfying his obligation under the settlement agreement. She simply concludes that since it is the only "trust" instrument benefitting Andrea and Stacey, it must have been created to satisfy Mark's obligation under the settlement agreement. Without more, this Court is not willing to leap to such a legal conclusion.
The Children's Trust Share was created in 1991, almost ten (10) years after his divorce from Elaine. It is a revocable trust in which Mark himself was the trustee (and Mark Twain Bank, the successor trustee), and all four of his daughters were the beneficiaries. Nowhere in this trust instrument does it reference the subject settlement agreement or divorce decree. When first created, there was no clear indication that the funding of the Children's Trust Share came from any or all insurance policies held by Mark. Defendants Wohl, Wohl, and Kopolow Exhibit E. Finally, the Children's Trust Share does not stipulate a minimum amount of $100,000.00 held in trust for Andrea and Stacey. It is clear to this Court that the creation of the Children's Trust Share was an independent undertaking by Mark to ensure additional financial security for all of his daughters, especially in the event of his death. It does not comport with the terms and conditions as set forth in Article II, Paragraph 5 of the subject settlement agreement.
The Court finds that after examination of the settlement agreement and the extrinsic evidence, it was the intention of both Mark *731 and Elaine that the subject Principal policy constitute the "insurance trust" referenced in the settlement agreement, Article II, Paragraph 5.
Having found that the Principal policy was the intended "insurance trust" referenced in the settlement agreement, the next question to be addressed concerns the effect of the settlement agreement (and incorporated in the divorce decree) entered into between Mark and Elaine, with respect to the legally proper beneficiary of the proceeds of the subject policy.
Melissa contends that since it is undisputed that the subject policy reserved to Mark the right to change the beneficiary, and furthermore, undisputed that Mark properly (procedurally) executed a change of beneficiary form naming Melissa the new beneficiary, then, there is no dispute that Melissa is entitled to the proceeds. This line of logic would be persuasive if it were not for the existence of the settlement agreement. Regardless of the fact that Melissa was the last designated beneficiary, the legal import of the settlement agreement was to make Andrea and Stacey the irrevocable beneficiaries of the subject policy.
Under the terms of the subject policy, Mark had the right to designate and/or change the beneficiary "subject to the consent of any irrevocable Beneficiary, at any time during the Insured's lifetime by written notice in form satisfactory to the Company." Defendants Wohl, Wohl, and Kopolow's Exhibit A  Bankers Life Co. Policy, Policy No. 2795695. A named beneficiary has only a contingent interest in the policy; i.e. a conditional interest or expectancy in the proceeds which can be terminated by the insured at anytime. Bell v. Garcia, at 190-91; Gibson, at 32-33. Even if a designated beneficiary receives the proceeds, s/he may still be liable to a second claimant for the proceeds received if the designated beneficiary was divested of his/her interest before it vested. Bell v. Garcia, at 191. Such a divesture takes place upon the insured entering into a contract obligating the insured to maintain the policy in favor of certain beneficiaries so named in the contract. It is well-established in Missouri that
"a contract obligating the insured to maintain a present policy in full force and effect for the benefit of certain beneficiaries named pursuant to an agreement is valid and that the beneficiaries so named acquire a right in the proceeds of the policy which will be protected against subsequently named beneficiaries who have no superior right."
General American Life Ins. Co. v. Rogers, at 697 citing Gibson, at 33-34 and Perry v. Perry, 484 S.W.2d 257 (Mo.1972). Consequently, in Missouri a property settlement and divorce decree providing for a certain party to be named as beneficiary of a life insurance policy is valid and enforcable against anyone subsequently named. Glover v. Metropolitan Life Ins. Co., 499 F.Supp. at 1313. Thus, Missouri law is well-settled that where beneficiaries have a vested equitable interest or a property right in the proceeds of the policy by contract of the parties, that interest may not be defeated by an effort to change the beneficiaries without their consent. General American Life Ins. Co. v. Rogers, at 697.
Even though Elaine was the formally named beneficiary on the policy until at least 1991, the settlement agreement and divorce decree constituted an equitable assignment of the policies for Andrea and Stacey's benefit[12] and gave them a vested right to the proceeds, subject to being defeated only by proof of a superior right. Melissa's status as a designated beneficiary by virtue of the execution of a standard change of beneficiary form fails to confer upon her a right to the insurance proceeds superior to the vested interests of Andrea and Stacey.[13] *732 It is clear that Andrea and Stacey were by the settlement agreement and divorce decree vested with an interest in the Principal policy which may not be defeated by Mark's effort to make Melissa the beneficiary in violation of the terms of the settlement agreement.
Melissa's alternative contention is that if the Court should find that Mark and Elaine intended for the Principal policy to satisfy Mark's obligations under Article II, Paragraph 5 of the settlement agreement, and that the settlement agreement conferred a vested equitable interest in the proceeds of the subject policy upon Andrea and Stacey, Andrea and Stacey would still be entitled to only $100,000.00 in proceeds, with the remainder going to her as the designated beneficiary. The Court disagrees.
The Court finds the language contained the subject paragraph to be unambiguous with regards to the value of the policy held in trust for Andrea and Stacey. It is clear to this Court that the phrase "he [a reference to Mark Wohl] shall maintain in full force and effect an insurance trust which has been created naming the children [Andrea and Stacey] the beneficiaries of not less than One Hundred Thousand Dollars ($100,000.00) face value of the proceeds" (emphasis added), was simply an attempt by the parties to mandate that Mark had to carry and maintain at least $100,000.00 worth of insurance naming Andrea and Stacey as the beneficiaries. It was a designation or description of the minium amount of insurance that would satisfy Mark's obligations. These are not words of limitation, rather just a means of helping to describe the Principal policy assigned to Andrea and Stacey as the irrevocable beneficiaries. See, Glover, 499 F.Supp. at 1314; Rogers, at 698. Nowhere in the settlement agreement is there any mention of limiting Andrea and Stacey to no more than $100,000.00 of insurance proceeds, with the remainder to another named individual. Mark was a businessman and had numerous conversations with his insurance agents Kopolow and Fitzgerald regarding his insurance coverage. The Principal policy was issued in 1975 and undoubtedly increased in value over the years; a fact that must have been apparent to Mark. There is nothing in the settlement agreement or in the record before this Court which evidences any attempt by Mark to assign only the first $100,000.00 value of the policy to Andrea and Stacey rather than the entire value (including subsequent increases) to them. The Court concludes that the settlement agreement and divorce decree did not limit the proceeds to $100,000.00 but instead designated the total proceeds of the Principal policy for the benefit of Andrea and Stacey.
Finally, a matter secondary to the primary issues raised in this case must be addressed. Elaine initially submitted a claim directly to the interpleader plaintiff Principal Mutual Ins. Co. for the Principal policy proceeds on behalf of Andrea only. She and Andrea were under the impression that, under the terms of the settlement agreement, only Andrea was entitled to the proceeds because she was under twenty-one (21) when Mark died. Consequently, Andrea's summary judgment motion seeks the proceeds on her behalf only. Despite repeated assurances that she will share the proceeds with her sister Stacey, Stacey has filed a separate summary judgment motion seeking the insurance proceeds for herself and Andrea, and that such proceeds be equally divided between them.
After careful consideration of the matter, and a thorough reading of Article II, Paragraph 5 of the settlement agreement, the Court finds that the said paragraph is clear and unambiguous as to its intent that until Andrea and Stacey each attained the age of *733 twenty-one (21), Mark was obligated to maintain both Andrea and Stacey as the irrevocable beneficiaries of the Principal policy. Since Andrea was not yet twenty-one (21) when Mark died, both Andrea and Stacey remained the irrevocable beneficiaries of the Principal policy. Consequently, the Court finds that both Andrea and Stacey are the irrevocable beneficiaries of the Principal policy, and are entitled to equal shares of the insurance proceeds.
Given the above-findings, the Court finds the imposition of a constructive trust upon the proceeds of the Principal policy to be in order. Under established Missouri law, a constructive trust is an equitable method selectively used by the courts to remedy a situation where a party has been wrongfully deprived of some right, title, benefit or interest in property as a result of fraud or in violation of confidence or faith reposed in another. In re Jeter, 178 B.R. 787, 791 (W.D.Mo.1995); Fix v. Fix, 847 S.W.2d 762, 765 (Mo.1993); In the Estate of Davis, 954 S.W.2d 374, 379 (Mo.App.1997); Locke v. Locke, 901 S.W.2d 912, 915 (Mo.App. 1995); Imgrund v. LaRue, 851 S.W.2d 40, 43-44 (Mo.App.1993). Constructive trusts are technically not trusts but rather an equitable remedy employed by the courts, in a variety of situations, to set aside wrongful ownership or interest in property gained through real or constructive fraud. Davis, at 379; Imgrund, at 43-44, n. 2. One circumstance where a court may impose a constructive trust is where a confidential relationship was breached. Davis, at 379; Imgrund, at 43-44. "A confidential relationship is generally synonymous with a fiduciary relationship. However, the relationship need not be technically fiduciary but may be merely informal." Imgrund, at 44 (citations omitted).
There is no question that a confidential relationship existed between Mark and the daughters of his first marriage. By virtue of his paternity, as well as the settlement agreement and divorce decree, he was obligated to provide a certain level of financial security for his (then) minor daughters. One means of satisfying this obligation was the maintenance of a certain amount of life insurance for their benefit. As minors, Andrea and Stacey had to depend on their father's willingness to carry out his financial obligations. They had no choice but to rely on his good faith to maintain the required life insurance with them as the irrevocable beneficiaries.
The evidence is equally clear that Mark committed a constructive fraud upon Andrea and Stacey by breaching this confidential and fiduciary relationship. "The breach of a fiduciary duty or confidential relationship may be constructively fraudulent. Proof of actual fraud is not necessary for the imposition of a constructive trust. The breach of a promise made during such a relationship will be considered constructively fraudulent because of the special reliance present." Davis, at 380. By attempting to designate others as beneficiaries, Mark (with Melissa's knowledge and assent) breached his duty to maintain the Principal policy in full force and effect for the benefit of his (then) minor daughters Andrea and Stacey until each had reached the age of twenty-one (21).
The Court finds that given the circumstances of this case, the imposition of a constructive trust on the entire proceeds of the subject Principal policy for the benefit of Andrea and Stacey is the proper equitable remedy. Thus, the proceeds of the subject Principal policy are payable to Andrea and Stacey.
In conclusion, the Court determines that no material issues of fact remain in dispute, and that, as a matter of law, summary judgment shall be denied to defendant Melissa Anne Wohl, summary judgment shall be granted to defendant Andrea Wohl in so far as being entitled to one-half of the proceeds of the subject Principal policy, and summary judgment shall be granted to defendant Stacey Wohl.

ORDER
In accordance with the memorandum filed herein this day,
IT IS HEREBY ORDERED that defendant Andrea Wohl, Robert Wohl, and Leroy Kopolow's motion for summary judgment (# 39) be and is GRANTED in so far that the insurance proceeds that the interpleader *734 plaintiff Principal Mutual has placed in the court registry shall be awarded in total to both Andrea and Stacey Wohl to be shared equally. Judgment is hereby entered in favor of the claims of defendants Andrea and Stacey Wohl and against the claim of defendant Melissa Anne Wohl for the subject insurance proceeds (plus interest accrued).
IT IS FURTHER ORDERED that defendant Stacey Wohl's motion for summary judgment (# 62) be and is GRANTED. Defendants Andrea and Stacey Wohl are hereby awarded the total amount of the insurance proceeds that the interpleader Principal Mutual has placed in the court registry (plus interest accrued); and shall share said proceeds equally. Judgment is hereby entered in favor of the claims of defendants Andrea and Stacey Wohl and against the claim of defendant Melissa Anne Wohl for the subject insurance proceeds (plus interest accrued).
IT IS FURTHER ORDERED that defendant Melissa Anne Wohl's motion for summary judgment (# 51) be and is DENIED.
IT IS FINALLY ORDERED that defendant Elaine S. Wohl Karney be and is DISMISSED from this cause of action. No claim for the subject insurance proceeds was ever asserted by defendant Elaine Wohl Karney on her behalf; and the claim asserted on behalf of defendant Andrea Wohl was subsequently asserted via defendant Andrea Wohl's motion for summary judgment.
NOTES
[1] Decedent Mark Wohl's second wife, Pamela Wohl, and the two (2) children of that marriage, are not parties to this federal cause of action.
[2] Defendant Melissa Anne Wohl also argues that said proceeds should be split between Andrea and Stacey Wohl; i.e. not the entire amount going to Andrea Wohl as argued by Andrea in her motion for summary judgment. The Court found defendant Melissa Anne Wohl's personal attack on the character of defendants Elaine Karney Wohl and Andrea Wohl as to their motive for not seeking the insurance proceeds on behalf of defendant Stacey Wohl to be malicious and unprofessional grandstanding on the part of counsel. Whatever the reasons, legal or otherwise, that has prompted Stacey Wohl to assert her claim separately from her sister is of no consequence to this Court, and has absolutely no legal impact upon the Court's final determination as to who is entitled to the proceeds.
[3] It appears that the terms "separation agreement" and "settlement agreement" are used interchangably throughout the divorce decree of Mark and Elaine, as well as throughout the parties' pleadings. The Court takes judicial notice that both terms identify the same agreement.
[4] At the time of the divorce, another life insurance policy existed; i.e. a $5000.00 policy on Elaine. However, the only policy subject to this lawsuit is the $100,000.00 policy on Mark Wohl (hereinafter referred to as the Principal policy).
[5] Premium Associate was always the "owner" of the subject policy. However, in all practical sense, Robert "owned" the policy since he was the President and majority shareholder of Premium Associates. However, in December 1992 Premium Associates redeemed all of Robert's outstanding stock and Robert retired. Mark became the sole shareholder and chief executive officer of Premium Associates; thus, the "owner" of the subject policy.
[6] It appears that the RLT, including the Childrens' Trust Share, was amended on October 11, 1994; March 16, 1995; and July 24, 1996. See, Defendants A. Wohl, R. Wohl, and L. Kopolow's motion for summary judgment, Exhibits G, H, and I.
[7] Since defendants A. Wohl, R. Wohl, and L. Kopolow are making a collective claim for the proceeds on behalf of A. Wohl, the Court will simply refer to their collective claim as being "A. Wohl's claim" for simplicity sake. Furthermore, Melissa has adopted her response to Andrea's summary judgment motion as her response to Stacey's summary judgment motion.
[8] There is no dispute that when the settlement agreement was drafted, Mark's obligation was to provide for both of his then minor daughters. The issue of which daughter or whether both daughters may presently benefit from the disputed insurance clause is not germane to the resolution of the limitations period issue. Both Stacey and Andrea are referred to collectively simply for clarity, and does not indicate the Court's resolution of which daughter (assuming the Court should find that the disputed insurance clause is enforcable and a constructive trust is imposed on the subject insurance proceeds) is entitled to the insurance benefits. The resolution of that issue will be dealt with later in this opinion.
[9] However, earlier cases interpreting Missouri law on this issue, allowed and considered testimony with respect to conversations with the decedent before and after the formulation and execution of a settlement agreement (containing provisions regarding insurance policies) which was later incorporated into a divorce decree. See, Glover, supra.; Gibson, supra. It appears that the distinction is that prior statements by the decedent may be considered regarding his or her's intentions with regard to the maintenance and/or distribution of subject insurance policies and proceeds, but that prior statements by the decedent as to his or her belief with respect to the meaning of any insurance clause provision in the settlement agreement may not be considered. Consequently, this Court will consider evidence regarding statements made by and conversations with decedent Mark Wohl only as to his intentions with regard to the use of the Principal policy to satisfy his obligations under Paragraph 5, but that the Court will not consider such evidence with regard to his belief as to the meaning of Paragraph 5.
[10] At the time of the divorce, the subject policy would have been referred to as the Bankers Life policy.
[11] In the affidavit Ms. Berkin states that Mark met with her in "1985"; however, she clearly attests that the conversation was in regard to Mark's insurance policies benefitting his children from both his marriage to Elaine and Pamela. Since his children with Pamela were born in 1986 and 1987, the date of "1985" must be a typographical error. The Court will assume, for the record, that the meeting Ms. Berkin describes took place in 1995, not 1985.
[12] This assignment was created as a matter of law and (although they have both acknowledged that they agreed to it) did not require the permission or acquiescence of either Robert Wohl or Elaine Wohl Karney.
[13] Melissa further argues that Paragraph 5 did not create a vested right in the insurance proceeds on behalf of Andrea and Stacey because it did not specifically identify the policy by name. In support of this argument she cites a passing reference in a footnote in Gibson in which it is stated that the principle regarding a vested equitable interest being created by a contract between the insured and the beneficiary named in the contract is not applicable "where the contract provides merely for the maintenance of a specified amount of insurance without description of a particular policy." Gibson, at 33, n. 3. This footnote cites the South Dakota case of Jacoby v. Jacoby, 69 S.D. 432, 11 N.W.2d 135 (S.D.Sup.Ct.1943). This dicta, contained in a footnote and based upon a case outside of Missouri, has not been repeated in any other case since. Nowhere in Glover, Bell v. Garcia, General American Life Ins. v. Rogers, Perry, or Gibson is this limitation mentioned. It is this Court's opinion that such a limitation never became embodied in the well-settled law of Missouri on this issue.