**UNION ELECTRIC CO. d/b/a AmerenUE, Respondent,**

v.

**METROPOLITAN ST. LOUIS SEWER DISTRICT, Appellant.**

No. SC 88637.

Supreme Court of Missouri, En Banc.

July 15, 2008.

Edward M. Kay, Melinda S. Kollross Clausen Miller, P.C., Chicago, IL, Adrian P. Sulser, Thomas M. Buckley, St. Louis, MO, for Appellant.

James J. Virtel, Karen A. Baudendistel, Cynthia A. Petracek, Armstrong Teasdale, LLP, St. Louis, for Respondent.

PATRICIA BRECKENRIDGE, Judge.

Metropolitan Sewer District ("MSD") appeals a jury verdict assessing 75 percent fault to MSD on AmerenUE's claim for contribution under section 319.085, RSMo 2000, a part of the Overhead Power Line Safety Act ("the OPLSA").[1] On appeal, MSD claims that the trial court erred in overruling MSD's motion for judgment notwithstanding the verdict because MSD does not fall within the definition of "persons" to whom the OPLSA applies. MSD next asserts that AmerenUE's claim for contribution is barred because: (1) it did not discharge MSD's liability to the Pages when AmerenUE settled with them for its own liability; (2) AmerenUE failed to prove that it paid more than its *pro rata* share of the Pages' total damages; and (3) MSD entered into a good faith settlement with the Pages. In the alternative, MSD asserts that the trial court erred in refusing to reduce the amount of the jury verdict as required by the damages cap set forth in section 537.610. MSD further claims that the trial court erroneously admitted expert testimony on the interpretation of contract language, which requires that the jury verdict be reversed and the cause remanded for a new trial.

---

1. All statutory citations are to RSMo 2000, unless otherwise indicated.

Following opinion in the court of appeals, this Court granted transfer and has jurisdiction. Mo. Const. art. V, sec. 10. Because the trial court erred in precluding consideration of MSD's settlement with the Pages of $6 million in computing MSD's contribution to AmerenUE, the judgment is affirmed in part and reversed in part, and the cause is remanded.

**Factual and Procedural Background**

MSD co-owns and maintains an easement in St. Louis County with AmerenUE. MSD contracted with Mulligan Construction Company ("Mulligan") to construct sewers and a storm water drainage channel on the easement. The project was in progress during December 1999. Anthony Page, a Mulligan employee, was a labor foreman on the project.

The sewers and drainage channel were being constructed below AmerenUE's power lines. As part of the construction process, a large crane lowered buckets of concrete into the ditch where the Mulligan employees were working. On December 27, 1999, it was Mr. Page's task to remove concrete from the bucket and empty it into the ditch. During this process, the bucket and the crane's cable made contact with a power line and became electrified. When Mr. Page grabbed the bucket, he received a severe electric shock, resulting in burns that necessitated amputation of his hands and left leg.

On the day of Mr. Page's accident, MSD had at least two supervisors on site at the construction project—Joseph Campisi, an MSD construction inspector, and Robert Dillman, a manager of construction. Mr. Campisi's job required him to observe materials being brought to the job site, make sure the materials complied with requirements, and keep track of the work progress and pay estimates. While at the construction site on December 27, 1999, Mr. Campisi observed that the crane was coming too close to the overhead power lines and was creating a potentially dangerous situation, and he reported that to Mr. Dillman. Mr. Dillman made no effort to intervene or halt the work, and following Mr. Campisi's warning, he, instead, left the area and walked away to inspect a manhole. Mr. Page was electrocuted approximately 20 minutes after Mr. Dillman received the initial warning from Mr. Campisi.

Following the accident, both Mr. Page and his wife, who brought a loss-of-consortium claim, sued the crane manufacturer (FMC Corporation), AmerenUE, and MSD. AmerenUE filed a cross-claim against MSD and a third-party petition against Mulligan, alleging that they violated the OPLSA and asserting a claim for contribution from them due to that violation.

The Pages settled with FMC for $3 million and dismissed their claim against FMC. AmerenUE, then, settled with the Pages for $6 million. Pursuant to this $6 million settlement, the Pages dismissed AmerenUE as a defendant. After it settled with the Pages, AmerenUE settled its cross-claim for contribution with Mulligan for $1.5 million, which it also paid to the Pages, and dismissed its OPLSA claim against Mulligan. AmerenUE maintained its OPLSA cross-claim against MSD. As a condition of its settlement with the Pages, AmerenUE agreed to pay the Pages 17 percent of any recovery it obtained from MSD on its OPLSA claim.

Eventually, MSD settled with the Pages in the amount of $6 million. All told, the Pages collected $3 million from FMC, $7.5 million from AmerenUE, including the $1.5 million from Mulligan, and $6 million from MSD, for a total of $16.5 million. After all of the settlements, the only claim remaining was AmerenUE's OPLSA cross-claim

against MSD. AmerenUE maintained its claim under section 319.085, seeking contribution to its $7.5 million settlement with the Pages, $6 million of which was outstanding after Mulligan's $1.5 million contribution to AmerenUE's settlement with the Pages.

AmerenUE's claim against MSD was tried to a jury. During trial, the court denied MSD's request that evidence of the total amount of the injury to the Pages caused by AmerenUE and MSD, shown by the combined settlement amounts paid by the two parties, be admitted. Instead, the trial court permitted the parties to present to the jury evidence of only AmerenUE's settlement amount, $6 million, as the damages to the Pages to which the percentages of fault of AmerenUE and MSD should be applied. The jury returned a verdict assessing 25 percent fault to AmerenUE and 75 percent fault to MSD. The trial court's judgment ordered MSD to pay AmerenUE 75 percent of AmerenUE's settlement of $6 million ($4.5 million). MSD moved for judgment notwithstanding the verdict, which was overruled by the trial court.

### MSD performed a function or activity under the OPLSA

■ AmerenUE's claim against MSD for contribution arises from sections 319.075 to 319.090–the OPLSA. The OPLSA establishes safety precautions governing activity near high voltage power lines and imposes penalties for violation of those precautions. One penalty is that the public utility that owns or operates the power line is given a "right of contribution" against any violator. Section 319.085. AmerenUE's claim is that MSD violated the OPLSA, and as a result, MSD is liable to AmerenUE for contribution for its settlement with the Pages.

The OPLSA safety precautions are found in sections 319.080 and 319.083. Section 319.080 states that "no person, individually or through an agent or employee" shall operate or move any machinery, equipment, or materials that conduct electricity within ten feet of any high voltage overhead line, unless danger against contact with the line has been guarded against, as provided in section 319.083. Another safety precaution in section 319.083 requires that any person or persons responsible for the "function or activity" intended to be carried out within ten feet of a high voltage power line shall notify the public utility that owns or operates the line and make arrangements "for temporary mechanical barriers, temporary deenergization and grounding of the conductors, temporary rerouting of electric current or temporary relocating of the conductors, before proceeding with any function or activity which would impair the clearances required."

MSD claims that, in the context of this case, the OPLSA does not govern MSD's actions because MSD does not fit within the statutory definition of "person". The OPLSA defines "person" as an individual or entity that "performs or contracts to perform any function or activity upon any land, building, highway or other premises in proximity to an overhead line." Section 319.078(4). Such person has a duty to notify the utility and arrange for temporary mechanical barriers, temporary deenergization and grounding of the conductors, or other safety precautions when the person desires to carry out any function or activity within ten feet of a high voltage power line. Section 319.083.1.

MSD's argument that it does not fit within the statutory definition of "person" focuses upon the "contracts to perform" language in the definition. It asserts that the phrase "contracts to perform" is in-

tended to include only the entity that was hired to perform the work and not the entity that contracted for the work to be performed. MSD argues that its contract with Mulligan for Mulligan to construct the sewer line and drainage channel established an independent contractor relationship with Mulligan so that MSD was not performing or contracting to perform the work.

It is not necessary to determine whether MSD's narrow interpretation of "contracts to perform" is correct, however, because MSD's role in the construction project falls clearly within the plain and ordinary meaning of other terms in the definition of "person." *Landman v. Ice Cream Specialties, Inc.,* 107 S.W.3d 240, 251 (Mo. banc 2003). The definition of "person" includes an entity that "performs . . . any function or activity upon any land . . . in proximity to an overhead line." Section 319.078(4).

Substantial evidence was presented at trial that MSD was performing a function or activity on land in proximity to an overhead line. The contract between MSD and Mulligan gave MSD a substantial role in the construction project. MSD was authorized by the contract, *inter alia,* to enforce safety regulations, determine whether the work would be suspended, fire and rehire workers, manage the schedule, and reject materials, all activities that integrally involved it in the construction project. The contract provided that MSD's inspectors be on site at the construction project when work was being performed. In fact, under the contract, all work was required to be done "only in the presence of [an MSD] inspector."

In accordance with the contract, two MSD inspectors were present on the construction site when Mr. Page was injured. Not only were MSD inspectors present, they were aware of the danger posed by the proximity of the crane to the power lines. Inspector Campisi observed the crane coming close to the power lines and reported the risk of contact with the power lines to his supervisor, Mr. Dillman.

By virtue of MSD's contractual responsibility for, and actual involvement in, organizing, managing, and supervising the project, MSD "perform[ed]" a "function or activity" within the definition of "person" in section 319.078(4) and that function or activity was integrally involved in the entirety of the construction project, including the activity of pouring concrete that was carried on within ten feet of the power line. MSD, thus, falls under the governance of the OPLSA.

MSD argues that it cannot be held liable under the OPLSA because it was merely a landowner that contracted with an independent contractor over which it did not exercise control. It further argues that it is not liable under master/servant principles because AmerenUE did not submit its case upon a *respondeat superior* theory. Analysis of these legal concepts is not relevant to the determination of MSD's liability under the OPLSA because the OPLSA imposes liability under its own provisions and does not utilize these legal concepts.[2]

---

2. *State ex rel. Union Electric Company v. Dolan,* 256 S.W.3d 77 (Mo. banc 2008), does not conflict with the holding or the reasoning of the present case. In *State ex rel. Union Electric,* this Court addressed a factually similar scenario in which the surviving wife of a plaintiff killed while working under Ameren-UE power lines brought a wrongful death suit. However, the claim in that case was not brought under the OPLSA and it was not a suit for contribution, like the present case. Short of the factual similarities, the two cases do not relate to one another.

### Legal Principles of Contribution Complementary to the OPLSA Right of Contribution

 MSD next asserts that the trial court erred in failing to apply statutory and common law principles governing contribution to AmerenUE's claim for contribution under the OPLSA. The section of the OPLSA relating to contribution is section 319.085. Section 319.085 creates a rebuttable presumption that a violator of the OPLSA was negligent and grants a public utility the right of contribution from the violator. Section 319.085 reads:

> If a violation of any of the provisions of section 319.075 to 319.090 results in physical or electrical contact with any high voltage overhead line such violation shall be a rebuttable presumption of negligence on the part of the violator in the event such violation shall cause injury, loss or damage *and, notwithstanding any other law to the contrary, the public utility shall have the right of contribution against any such violator.* In addition to any penalties provided herein, liability under common law may apply.

(emphasis added). In determining the meaning of this statute, the primary rule of statutory interpretation is to ascertain the intent of the legislature from the language used, to give effect to that intent if possible, and to consider the words used in their plain and ordinary meaning. *Landman*, 107 S.W.3d at 251.

The statutory language at issue mandates that "notwithstanding any other law to the contrary, the public utility shall have the right of contribution against any such violator [of the OPLSA]." Section 319.085. Syntactically, this provision must be read to mean that the right of contribution under the OPLSA supersedes other provisions of law to the contrary. MSD asserts that statutory and common law principles governing contribution are not laws to the contrary and are, instead, necessary to giving effect to the right of contribution. This Court agrees that it is impossible to give effect to the right of contribution granted a public utility without utilizing the laws governing contribution to the extent that they are not contrary to the OPLSA. The question is which principles of contribution are necessary to give effect to the OPLSA and which are contrary to its purpose.

In this case, MSD argues that its separate $6 million settlement payment to the Pages should extinguish its liability to AmerenUE since AmerenUE failed to discharge MSD's liability in its settlement with the Pages for which it now seeks contribution. *Lowe v. Norfolk & W. Ry. Co.*, 753 S.W.2d 891, 894–95 (Mo. banc 1988) (holding that one who settles in good faith is discharged from further contribution liability). Section 537.060 explains the requirement that a settling party must discharge the liability of any joint tort-feasor from whom contribution is sought as follows: "When an agreement by release, covenant not to sue or not to enforce a judgment is given in good faith to one of two or more persons liable in tort for the same injury or wrongful death ... such agreement shall discharge the tort-feasor to whom it is given from all liability for contribution or noncontractual indemnity to any other tort-feasor...." MSD further relies upon the provisions in section 537.060 that a tort-feasor who enters into a good-faith settlement is discharged from "all liability for contribution ... to any other tort-feasor." MSD also argues that general contribution principles require that AmerenUE prove that it paid more than its *pro rata* share of the Pages' total damages, which it failed to do.

 Inherently, the right of contribution is based on proportionately dividing the plaintiff's overall damage figure ac-

cording to the parties' degrees of fault. *Missouri Pac. R. Co. v. Whitehead & Kales*, 566 S.W.2d 466, 472 (Mo. banc 1978). "To maintain an action for contribution, both the party seeking contribution and the 'defendant against whom contribution is sought must be ... tortfeasor[s], originally liable to the plaintiff-injured party.'" *Gramex Corp. v. Green Supply, Inc.*, 89 S.W.3d 432, 442 (Mo. banc 2002) (quoting *Safeway Stores, Inc. v. Raytown*, 633 S.W.2d 727, 730 (Mo. banc 1982)).

▆▆▆ Generally, when the party seeking contribution has settled with the original plaintiff, the settling party has a right of contribution " 'only (1) if the liability of the person against whom contribution is sought has been extinguished; and (2) to the extent that the amount paid in settlement was reasonable.'" *Id.* (quoting *St. Joseph's Hosp. v. Schierman*, 829 S.W.2d 4, 6 (Mo.App.1991)).[3] The rationale for requiring the settling party to discharge the liability of the party against whom contribution is sought is based upon principles of fairness, which require that the defendant from whom contribution is sought not bear an unfair burden. *Teeter v. Missouri Hwy. and Transp. Comm'n.*, 891 S.W.2d 817, 820 (Mo. banc 1995). Under the common law and under section 537.060, to fairly distribute the burden between the settling party seeking contribution and the defendant from whom contribution is sought, the settlement of the party seeking contribution must have established the plaintiff's overall damage figure because it is the basis for apportioning

the parties' fault. *Whitehead & Kales*, 566 S.W.2d at 472. Section 537.060, like the common law, also provides that a tortfeasor who settles with the injured party cannot be found liable for any further noncontractual contribution.

▆▆▆ The issue is, to the extent that these common law rules would prohibit AmerenUE from collecting contribution from MSD, whether they necessarily conflict with section 319.085, which expressly states that *"notwithstanding any other law to the contrary, the public utility shall have the right of contribution against any such violator."* The answer is "yes". Both the common law principle and section 537.060 were intended to assure that the party from whom contribution is sought does not bear an unfair burden. Section 319.085 reflects a legislative determination that in the case of its violation, a fair result is achieved if the utility is permitted to obtain contribution from the actual violator, regardless of the traditional defenses that might otherwise apply. To give this right meaning, however, the contribution right must be applied to the overall share of fault attributable to both the violator and the utility, for contribution implies a joint liability, and if only one party's liability is considered, the equation is incomplete. Thus, consideration of both parties' contributions to the harm is necessary in order to allocate fault under section 319.085.

Here, the amount of MSD's settlement with the Pages is available for consideration in the calculation of the Pages' over-

---

**3.** Adopted by the legislature in 1983, section 537.060 codifies the common law doctrine known as "settlor-barred." *See Hampton v. Safeway Sanitation Servs.*, 725 S.W.2d 605, 607 (Mo.App.1987) ("This statute, we believe, is part and parcel of the comprehensive, modern and changing scheme relating to the substantive law of torts designed to achieve a fair system of justice. Undoubtedly, our statute is based upon the philosophy and policy found in, and derived from the express language embodied in, the Uniform Contribution Among Tortfeasors Act adopted by the Commissioners on Uniform State Laws."). *See also Cardinal Glennon Hosp. v. American Cyanamid Co.*, 997 S.W.2d 42, 45 (Mo.App. 1999) (discussing the settlor-barred doctrine).

all damage figure. Thus, the trial court was correct in not barring AmerenUE's claim for contribution merely because it did not discharge MSD's liability when it settled with the Pages or because MSD had reached a settlement of its own liability with plaintiffs. It did err in excluding evidence of the Pages' overall amount of damages caused by both AmerenUE and MSD so that the judgment for contribution was based on only the amount of AmerenUE's settlement, $6 million. As noted earlier, the very concept of contribution means proportionately dividing the plaintiff's overall damage figure according to the parties' degree of fault. A foundation of this right is that a party should not be forced to pay more than its share of the fault. *Teeter*, 891 S.W.2d at 820. The trial court's judgment requires that MSD pay more than its share of fault because MSD paid $6 million in damages to the Pages to settle its own liability—and then was ordered to pay 75 percent of AmerenUE's $6 million damages. MSD's *pro rata* share was 75 percent of the Pages' total damages, not 75 percent of AmerenUE's damages.

The record shows that the total of the Pages' damages was $12 million. MSD paid $6 million and AmerenUE paid $6 million. The jury determined that AmerenUE was 25 percent at fault and MSD was 75 percent at fault. AmerenUE's fault therefore, should be limited to 25 percent of $12 million, i.e., $3 million. It is entitled to contribution from MSD to the extent that it paid more than that sum.

MSD's remaining claims of error are still relevant to its liability for contribution to AmerenUE, however, so they will be addressed.

### The OPLSA's Impact on a Statutory Damages Cap

■ In the alternative to the two arguments discussed above, MSD argues that the trial court erred in refusing to reduce the amount of the jury verdict in accordance with the damages cap set forth in section 537.610.2. MSD argues that the damages cap should be read as a law complementary to the "right of contribution" set out in section 319.085. Section 537.610.2 provides that:

> The liability of the state and its public entities on claims within the scope of sections 537.600 to 537.650, shall not exceed two million dollars for all claims arising out of a single accident or occurrence and shall not exceed three hundred thousand dollars for any one person in a single accident or occurrence, except for those claims governed by the provisions of the Missouri workers' compensation law, chapter 287, RSMo.

The damages cap of $300,000 for claims "arising out of a single accident" has no application in this case. Section 537.610.2 applies only to those claims "within the scope of section 537.600 to 537.650." Sections 537.600 to 537.650 govern waivers of sovereign immunity. The trial court found, and MSD does not dispute, that MSD did not have sovereign immunity from AmerenUE's OPLSA claim. MSD does not argue that 537.600's provision for sovereign immunity should protect it from liability, but merely that the damages cap spelled out in the sovereign immunity statute should apply to the verdict.

The OPLSA's provision for liability of a public entity waives any potential sovereign immunity under section 537.600. *See Bachtel v. Miller County Nursing Home Dist.*, 110 S.W.3d 799, 804 (Mo. banc 2003) (finding that sovereign immunity did not shield a nursing home from liability under the Omnibus Nursing Home Act because the "express provision that the Act is applicable to nursing home districts constitutes a waiver of sovereign immunity to

the extent necessary to enforce the provisions of the Act as to those districts"). Section 537.610.2 applies only to "claims within the scope of sections 537.600 to 537.650." Because this case does not fall within the scope of the sovereign immunity provisions of 537.600, the damages cap described in section 537.610 has no bearing on the claim.

## Admission of Expert Testimony Regarding Contract Language Interpretation

█ In its last point, MSD argues that the trial court erred in admitting the testimony of AmerenUE's expert, Dr. Douglas Gransberg, who testified regarding the construction of the MSD–Mulligan contract. MSD argues that contract construction is a matter of law, and therefore, expert testimony is irrelevant (citing *Nodaway Valley Bank v. E.L. Crawford Constr., Inc.,* 126 S.W.3d 820, 825 (Mo. App.2004)). MSD is correct that typically, contract construction is not a suitable subject for expert testimony. *See* AM.JUR.2D *Expert and Opinion Evidence* [sec.] 354 (2008) ("The view has been followed that the construction of unambiguous contract terms is strictly a judicial function, and that the opinions of percipient or expert witnesses regarding the meanings of contractual provisions are irrelevant and hence inadmissible.")

█ Although there is a general prohibition on expert interpretation of contract language, a party may open the door to otherwise inadmissible testimony from the opposing side if it first introduces such evidence. For example, in *Park Lane Med. Ctr. Of Kansas City, Inc. v. Blue Cross/Blue Shield of Kansas City,* 809 S.W.2d 721, 725 (Mo.App.1991), the plaintiff hospital appealed in part on the ground that the trial court had improperly admitted extrinsic evidence of the parties' intent

in the formation of a settlement agreement. The court held that "Park Lane c[ould not] complain on appeal that allowing extrinsic or parol evidence is error after introducing such evidence at trial." *Id.* The court observed that the argument on appeal was particularly misguided because "not only did Park Lane not object to extrinsic evidence proffered by the defendants, it was the first to offer extrinsic evidence of intent." *Id.*

Similarly, here, MSD opened the door for expert testimony regarding the contract language during its examination of the MSD construction manager, Robert Dillman. In questioning Mr. Dillman, MSD's counsel asked him whether "Mulligan is given a contract to do the job, is that right?" and then followed that question by drawing Dillman's attention specifically to the language in "subparagraph B" of the MSD–Mulligan contract. Counsel then asked Mr. Dillman whether "*under that contract,* were they [Mulligan] required to make notification to the utility, AmerenUE, if they felt that they were gonna be getting anywhere near electrical wires," to which Mr. Dillman responded, "That's correct." Counsel was not asking for Mr. Dillman's personal understanding of his duties, but rather, for his evaluation of the meaning of the contract language. In so doing, MSD opened the door for the testimony of AmerenUE's expert, Dr. Gransberg, on the meaning of the contract.

## Conclusion

MSD was engaged in tasks integral to the sewer construction, which construction included the activity of pouring concrete in proximity to an overhead line, so MSD was "performing" a function or activity within the meaning of section 319.085(4). Legal principles that are not essential to the right of contribution—such as requiring the settling party to extinguish the liability

of the party against whom contribution is sought in order to have a right to seek contribution—constitute "laws to the contrary" within the meaning of section 319.085 and contribution will be permitted for the proportionate share of the two parties to the injured party's overall damage figure. Here, MSD's settlement with the Pages allowed establishment of the Pages' overall damage figure attributable to AmerenUE and MSD, which could be divided proportionately according to those parties' degree of fault. Although the trial court correctly found that contrary legal principles were not applicable, it erred when it precluded consideration of the Pages' overall damage figure in apportioning the parties' fault. The record shows that the overall damage figure is $12 million, of which AmerenUE is entitled to contribution to the extent that it has paid more than its 25 percent share of fault.

The judgment is reversed as to the amount of contribution AmerenUE is to receive from MSD. In all other respects, the judgment is affirmed. The case is remanded.

All concur.