Carl EISENMANN, et al., Plaintiffs,

v.

Richard PODHORN, et al., Defendants,

Beris Construction, L.L.C.,
Respondent/Cross–
Appellant,

and

C.B. Engineering, Inc.,
Appellant/Cross–
Respondent.

No. ED 103171

Missouri Court of Appeals,
Eastern District,
DIVISION ONE.

Filed: May 9, 2017

Motion for Rehearing and/or Transfer
to Supreme Court Denied June
22, 2017

Steven M. Cockriel, Michael J. Rolwes, St. Louis, MO, for Appellant.

Brandon B. Copeland, David P. Bub, St. Louis, MO, for Respondent.

ROBERT M. CLAYTON III, Presiding Judge

C.B. Engineering, Inc. ("Appellant") appeals the judgment entered upon a jury verdict awarding Beris Construction, L.L.C. ("Respondent") $51,500 on Respondent's claims for professional negligence and contribution. Respondent cross-appeals the jury's damages award. We affirm in part, reverse in part, and remand for a new trial on damages.

## I.  BACKGROUND

### A.  Facts Giving Rise to the Underlying Dispute

Carl and Jessica Eisenmann (collectively "Plaintiffs")[1] contracted with Parkway Joint Venture to build a home at 115 Place de Yeager ("Lot Eight"), part of the Chateau Du Bois subdivision in the City of Lake Saint Louis, Missouri ("the City"). Parkway Joint Venture then contracted with Respondent to serve as the general contractor for the project. Respondent was owned by Richard Podhorn, who was also the manager of Parkway Joint Venture. Respondent hired Michael Schwada as the project manager to oversee construction of Plaintiffs' home.

Parkway Joint Venture hired M Engineering to prepare grading plans for the Chateau Du Bois subdivision and the plot plan for Lot Eight, which showed the final planned grades and location of the home on the lot. The plot plan for Lot Eight

---

1.  Because Plaintiffs share the same last name, we will refer to them as Carl and Jessica when discussing them individually for clarity and ease of reference. No disrespect is intended.

contained no specifications for the grading to be performed on the lot prior to construction, therefore, the grading was conducted pursuant to the specifications contained in the subdivision grading plans. In relevant part, these specifications provided that all the fill used must consist of low plastic soils as approved by the soils engineer.

Before construction could begin on Lot Eight, soil work was needed including leveling the lot down to the natural earth and bringing in a significant amount of soil fill. The fill brought onto Lot Eight had to be laid, leveled, packed, and tested. Because Respondent did not employ engineers, Respondent hired Appellant to perform soil testing and observation on Lot Eight and to provide a letter from a professional engineer to the City certifying the soil was properly compacted and would support the home.[2]

Once Lot Eight was excavated down to reach natural dirt, Schwada had Appellant inspect the excavation and verify that it was sufficient. Then, fill dirt was laid on the lot in one-foot lifts and compacted. After each lift of fill was laid and compacted on Lot Eight, Schwada contacted Appellant to test or observe the fill on the site, in order to verify the lift's compaction rate was acceptable before the next lift was laid. However, Appellant did not test or observe at least one lift's compaction rate. The layer of fill not tested or observed by Appellant was the lift between six and seven feet below grade.

Before issuing a building permit, the City required: "Prior to the placement of concrete the sub grade shall be tested by an approved geotechnical firm to insure the bearing capacity of the sub grade. A report of this test shall be provided to the Lake Saint Louis Building Department." This report was part of the work for which Respondent hired Appellant. On December 2, 2011, Appellant sent Schwada the certification letter for Lot Eight, which was completed by Appellant's employees Blake Marquart and Karen Albert, a professional geotechnical engineer.

The certification letter, bearing Albert's professional seal, stated, "Cochran was on site to perform compaction observation and testing services on the fill materials placed to bring the lot to basement subgrade elevation." The letter then outlined the services performed by Appellant and its findings. The letter explained fill materials "consisting of high plastic clay, clayey rock, and low plastic silty clay" were placed in approximately one-foot thick lifts, and "the materials were tested to meet project specifications. Materials not able to be tested were visually observed and approved." The letter concluded, "[n]o soft unacceptable areas were observed," and, "the materials placed under observation met or exceeded the minimum compaction requirements and are suitable for support of the residential construction."

The certification letter contained no limitation or qualification as to the extent of Appellant's testing or observation of the soils on Lot Eight. There was no disclaimer that Albert did not review the grading specifications, which mandated no high plastic soils were to be used in the fill material. Further, the letter did not indicate Appellant did not test or observe placement of all the lifts of fill laid on Lot Eight. Appellant did not state in the certi-

---

2.  Appellant and M Engineering collectively make up Cochran Engineering ("Cochran"), Appellant is Cochran's office in Union, Missouri and M Engineering is the Wentzville, Missouri office. However, the two entities played separate and distinct roles in the events giving rise to this appeal, and we will treat them as two separate entities for purposes of this appeal.

fication letter or inform Respondent or the City that it did not test or observe the lift of fill between six and seven feet below grade.[3]

Respondent relied on the certification letter to ensure the soil would support the weight of Plaintiffs' home. Respondent then provided the letter to the City, and the City relied on its certifications when issuing the building permit to allow Respondent to proceed with construction on Lot Eight. If the letter had not been supplied to the City, the City would not have issued a building permit and Plaintiffs' home would not have been built. Further, if the letter had indicated Appellant did not test or observe all of the lifts placed on Lot Eight, the City would have rejected the certification letter and would have required the proper certification.

On March 17, 2012, Carl noticed cracking and leaking in the basement of the house and informed Respondent of the issue. On or around March 26 or 27, 2012, Tom Rothermich of Flint Hill Engineering went to Lot Eight to consult on the installation of a retaining wall at the request of Podhorn and Cochran. Rothermich was not informed of any problems regarding slope failure when he was asked to design and install the retaining wall. Therefore, Rothermich did not perform any additional soil stability or global stability analysis of the area where the retaining wall was to be installed. After the wall was completed on April 4, 2012, Rothermich provided a letter stating the construction of the wall with Redi–Rock was acceptable and conformed with or exceeded the design criteria.

Subsequently, Plaintiffs observed more cracks in the walls and foundation prior to closing on the home, brought the cracks to Podhorn's attention, and the cracks were sealed. In an email sent on June 10, 2012, Carl demanded an additional warranty to specifically address the "significant settling and cracking of the foundation" to cover future repairs for no less than ten years. On June 22, 2012, no cracks remained and Plaintiffs closed on the house, purchasing it for approximately $615,000. Plaintiffs had not received the additional warranty prior to that date, but received a warranty shortly after closing.

The cracks observed in the house prior to closing resurfaced and were progressively expanding at the time of trial, and the house slid down the lot's rear slope. On October 5, 2012, Plaintiffs' home was condemned by the City, as it was determined the house was unsound and no longer suitable for habitation. The City found that, *inter alia*, the foundations did not adequately support the structure.

**B. Relevant Procedural Posture**

On November 27, 2012, Plaintiffs filed a multi-count petition against Respondent, Appellant, Podhorn, and M Engineering[4] in the Circuit Court of St. Louis County, and venue was later changed to the Circuit Court of St. Charles County. Respondent filed crossclaims against Appellant for professional negligence, negligent misrepresentation, fraudulent misrepresentation, indemnification, and contribution.[5] Respon-

---

3. While Schwada testified he was told on a couple occasions that Appellant was going to observe two lifts at one time, there is no evidence he knew the lift between six and seven feet was never tested or observed, or that this information was ever communicated to Podhorn or Respondent.

4. Plaintiffs' first amended petition included as defendants several other parties who were

involved in the construction of the Plaintiffs' home or the retaining wall behind the home. However, those claims were dismissed or otherwise disposed of prior to trial and are not relevant to this appeal.

5. Respondent also filed a crossclaim against M Engineering, but the jury returned a verdict in favor of M Engineering and Respondent did not appeal the jury's decision. Thus,

dent filed additional crossclaims for indemnity and contribution against Crossroads Development, Inc. and Schrieter Concrete Company, two other subcontractors who worked on Lot Eight. The trial court granted all parties leave to amend their pleadings, to plead setoffs due to settlements, through the end of trial.

A few days before the trial was set to begin, Plaintiffs settled their claims against Respondent and Podhorn for $515,000. A settlement and release agreement was executed, which included a dismissal of any claims Plaintiffs had against Respondent, Podhorn, Appellant, and M Engineering. Respondent also stipulated to settlement of its crossclaims against Crossroads Development, Inc. and Schreiter Concrete Company for $75,000 and $5,000, respectively.

Respondent's crossclaims against Appellant proceeded to a jury trial, which was held May 5, 6, 7, and 11, 2015. In addition to the facts recounted in Section I.A. above, both parties presented their own theory as to the cause of the damage to Plaintiffs' home and introduced evidence to support their theories.[6] At the end of Respondent's case-in-chief and again at the end of all the evidence, Appellant and M Engineering filed motions for a directed verdict. All motions for directed verdict were denied by the trial court.

During the jury instruction conference, Appellant tendered Instruction Eight, which the trial court accepted. Instruction Eight provided for the subtraction of any damages from Respondent's total award if the jury found Plaintiffs failed to mitigate their damages. Respondent timely object-

ed to Instruction Eight and requested that the trial court submit Missouri Approved Instruction ("MAI") 4.01,[7] but the request was denied. The court submitted four verdict directors to the jury, Instructions Nine through Twelve. Instruction Nine explained to the jury how they were to determine the reasonableness of the settlement between the Plaintiffs and Respondent. Instructions Ten through Twelve provided for the specific claims against Appellant and M Engineering. Each of these verdict directors required the jury to find, "[Respondent's] settlement of the claims of [Plaintiffs] was reasonable." Verdict Form 2, which required the jury to apportion fault between Appellant and M Engineering, did not allow the jury to allocate any fault to Respondent and did not require the jury to ensure the percentages of fault added up to 100%.

On May 11, 2015, the jury returned a verdict in favor of Respondent on its professional negligence claim against Appellant, assessed Respondent's damages at $51,500, and found Appellant 100% at fault.

Subsequently, Appellant filed a motion for reduction or setoff against the jury verdict based on Respondent's settlements with Crossroads Development, Inc. and Schreiter Concrete Company. Appellant also moved for a judgment notwithstanding the verdict, arguing, (1) there was no evidence showing Appellant was professionally negligent; (2) there was no evidence to prove Appellant's alleged negligence caused the damage to Plaintiffs' home; (3) Respondent could not recover in contribution because it did not prove its own liability to Plaintiffs; and (4) the re-

all references to M Engineering are only to provide context for the present appeal.

**6.** The specific evidence introduced to support each theory on causation will be set forth in Section II.A.3. below.

**7.** All references to the MAI and its Notes on Use are to versions found in Missouri Approved Jury Instructions-Civil (7th ed. 2012).

quested reduction or setoff of $80,000 would eliminate any damage award to Respondent as it exceeded $51,500, so judgment must be entered in favor of Appellant.

Respondent timely filed responses to Appellant's motions. Respondent then filed a motion for additur, or in the alternative, a motion for new trial on the issue of damages, arguing its damages were fixed by the jury's finding Respondent's settlement with Plaintiffs was reasonable, and that the non-MAI Instruction Eight was improper.

On June 4, 2015, the trial court denied all relevant post-trial motions. On June 5, 2015, the trial court entered its judgment in accordance with the jury's verdict. Both parties appeal.

## II. DISCUSSION

Appellant raises three points on appeal, and Respondent raises two points on cross-appeal. In its first and second points on appeal, Appellant argues the trial court erred in denying its motions for directed verdict and motion for judgment notwithstanding the verdict, because Respondent failed to present a submissible case for contribution. In Appellant's third point on appeal, it alleges trial court error regarding its requested setoffs. In Respondent's first point on cross-appeal, it argues the trial court erred in denying Respondent's motion for additur, or alternatively, motion for new trial because Respondent's damages were fixed by the jury's finding that Respondent's settlement with Plaintiffs was reasonable. Finally, in its second point on cross-appeal, Respondent contends the trial court erred in giving Instruction Eight to the jury, because the non-MAI instruction on mitigation of damages was improper and confused the jury.

### A. Points on Appeal Relating to Submissibility of Respondent's Claim for Contribution

In its first and second points on appeal, Appellant argues the trial court erred in denying its motions for directed verdict and motion for judgment notwithstanding the verdict, because Respondent failed to present a submissible case for contribution. In Appellant's first point on appeal, Appellant asserts Respondent failed to present "any evidence" to establish its own liability to Plaintiffs. In its second point on appeal, Appellant contends Respondent failed to present "any evidence" that Appellant's negligence caused Plaintiffs' injury.

### 1. Standard of Review and General Law Relating to Contribution

■■■ Appellate review of the denial of a motion for directed verdict and the denial of a motion for judgment notwithstanding the verdict is essentially the same. *Sanders v. Ahmed*, 364 S.W.3d 195, 208 (Mo. banc 2012). Pursuant to our standard of review, we must determine whether the plaintiff made a submissible case, which is a question of law we review de novo. *Delacroix v. Doncasters, Inc.*, 407 S.W.3d 13, 26, 39 (Mo. App. E.D. banc 2013). To make a submissible case, the plaintiff must support each element of its claims with substantial evidence. *Id.* at 26. Substantial evidence is described as "that which, if true, has probative force upon the issues, and from which the trier of fact can reasonably decide a case." *Arkansas–Missouri Forest Products, LLC v. Lerner*, 486 S.W.3d 438, 447 (Mo. App. E.D. 2016) (quotations omitted).

■■■ In determining whether the plaintiff made a submissible case, we view the evidence and all reasonable inferences therefrom in the light most favorable to the plaintiff, and all contrary evidence and

inferences are disregarded. *Delacroix*, 407 S.W.3d at 26. "The jury's verdict will be reversed only if there is a complete absence of probative facts to support the jury's conclusion." *Id.* (quoting *Keveney v. Missouri Military Academy*, 304 S.W.3d 98, 104 (Mo. banc 2010)). Thus, if reasonable minds could differ as to the question before the jury, an appellate court will not disturb the jury's verdict. *Dubinsky v. U.S. Elevator Corp.*, 22 S.W.3d 747, 749 (Mo. App. E.D. 2000).

■ Respondent brought the present action seeking contribution from Appellant, as a joint tortfeasor, for a portion of the damages Respondent paid to Plaintiffs. "When two or more persons become liable in tort to the same person for the same harm, there is a right of contribution among them." *Miles ex rel. Miles v. Rich*, 347 S.W.3d 477, 482 (Mo. App. E.D. 2011) (quoting *Gramex Corp. v. Green Supply, Inc.*, 89 S.W.3d 432, 442 (Mo. banc 2002)) (internal quotations omitted). The purpose of the right to contribution is to proportionately divide the injured party's overall damage figure according to the joint tortfeasors' relative degrees of fault. *Union Elec. Co. v. Metropolitan St. Louis Sewer Dist.*, 258 S.W.3d 48, 54–55 (Mo. banc 2008). To maintain an action for contribution, the party seeking contribution as well as the party against whom contribution is sought must be joint tortfeasors, both originally liable to the injured party. *Miles*, 347 S.W.3d at 482.

### 2. Whether Respondent Presented Evidence of its Liability to Plaintiffs

■ Regarding Appellant's first point challenging the evidence presented as to Respondent's liability to Plaintiffs, we must first address whether Appellant has sufficiently preserved each of its arguments on appeal. In support of this point, Appellant argues Respondent cannot seek contribution from Appellant because Respondent failed to admit its own liability at trial, and even if Respondent was not required to admit liability, it failed to present "any evidence" of its own liability to Plaintiffs. Appellant also argues, "[t]here is no cause of action in tort for a builder's alleged negligence in the construction of a residence," and Plaintiffs could have only recovered from Respondent via contract remedies. Thus, according to Appellant, Respondent is not a "joint tortfeasor," and cannot seek contribution from Appellant.

■ Generally, we conclude Appellant preserved its claim that Respondent failed to present evidence of its own liability to the Plaintiffs, because it was raised in Appellant's motion for directed verdict at the close of all the evidence. *See Sanders*, 364 S.W.3d at 207 (when a defendant presents evidence at trial, "[a] motion for directed verdict at the close of all evidence becomes the meaningful motion to preserve the issue"). However, our review of the record reveals Appellant's argument that tort remedies were unavailable to Plaintiffs against Respondent was never presented to the trial court, and may not be raised for the first time on appeal. *See Marquis Fin. Servs. of Indiana Inc. v. Peet*, 365 S.W.3d 256, 259–60 (Mo. App. E.D. 2012) and *Gill Const., Inc. v. 18th & Vine Authority*, 157 S.W.3d 699, 722 (Mo. App. W.D. 2004) (an issue not raised in a motion for directed verdict cannot be used to seek a judgment notwithstanding the verdict on that ground, nor will it be a basis for appellate review of the trial court's denial of a judgment notwithstanding the verdict on that issue). Therefore, we decline to address said argument.[8] *See id.*

---

8. Although we need not rule on this argument, we find the cases cited by Appellant, in

■ Moving to Appellant's assertion that Respondent was required to admit its liability, Appellant bases its argument on the following question asked by Respondent's attorney to potential jurors during voir dire:

What you will hear in this case is that we have settled our claim, our dispute or issue with the homeowners, [Plaintiffs]. But that's not an admission of liability. Does everyone here understand that? Is there anyone who believes that just because we settled our dispute with the [Plaintiffs] that we somehow are admitting liability or we must have been at fault?

■ Appellant contends this question essentially precluded Respondent from being able to prove its liability to Plaintiffs. However, the Missouri Supreme Court has declared a settling party who is seeking contribution is not required to admit fault. *Travelers Property Cas. Co. of America v. Manitowoc Co., Inc.*, 389 S.W.3d 174, 175–76, 179 (Mo. banc 2013). Additionally, statements made and questions asked by attorneys during voir dire are not evidence. *Andersen v. Osmon*, 217 S.W.3d 375, 381 (Mo. App. W.D. 2007); *Pollard v. Whitener*, 965 S.W.2d 281, 298 n.3 (Mo. App. W.D. 1998) (Stith, J., dissenting).

Nevertheless, after reviewing the actual evidence adduced at trial, in the light most favorable to the jury's verdict and disregarding all contrary evidence, we find Respondent satisfied its burden of proving its own liability. *See Miles*, 347 S.W.3d at 482; *see also Delacroix*, 407 S.W.3d at 26. During trial, Respondent elicited testimony from at least two witnesses regarding the settlement reached between Respondent,

Podhorn, and Plaintiffs. The following transpired during Podhorn's testimony:

[Respondent's Counsel]: [Plaintiffs] settled their claim against [Respondent]?

[Podhorn]: That's correct.

[Respondent's Counsel]: What's your understanding of the terms of the settlement?

[Podhorn]: They accepted five hundred fifteen thousand dollars from [Respondent].

[Respondent's Counsel]: And the main subcontractors in exchange for the five hundred fifteen thousand dollars, they did what you call a release of the claims, correct?

[Podhorn]: Yes.

. . .

[Appellant's Counsel]: With respect to this settlement, did the [Plaintiffs] settle all of the claims against yourself personally and [Respondent]?

[Podhorn]: I believe so . . . .

Later, Carl testified to the following:

[Respondent's Counsel]: . . . . Originally, you and [Jessica] filed suit against several parties, one of them being [Respondent], correct?

[Carl]: Correct.

[Respondent's Counsel]: Now, you've settled that claim with [Respondent], correct?

[Carl]: Correct.

---

support of his assertion Plaintiffs would not have been able to recover from Respondent in tort, were not in the context of contribution and thus are distinguishable from the present case. *See Captiva Lake Investments, LLC v.*

*Ameristructure, Inc.*, 436 S.W.3d 619 (Mo. App. E.D. 2014); *Grgic v. Cochran*, 689 S.W.2d 687 (Mo. App. E.D. 1985); *Clark v. Landelco, Inc.*, 657 S.W.2d 634 (Mo. App. W.D. 1983).

[Respondent's Counsel]: And what—what amount did you settle the claim for?

[Carl]: Five twenty-five.[9]

[Respondent's Counsel]: And do you think that that's a reasonable settlement given that you purchased the house for six fifteen?

[Carl]: No.

[Respondent's Counsel]: No? What do you think?

[Carl]: Well, I would have liked to have gotten whole.

[Respondent's Counsel]: Okay. So, you think it's a little low even?

[Carl]: Yes.

██ The preceding evidence was not objected to, but was admitted in contravention of the general rule precluding evidence of settlement offers. *See, e.g., Ullrich v. CADCO, Inc.*, 244 S.W.3d 772, 780 (Mo. App. E.D. 2008). Evidence of settlement offers or agreements is generally inadmissible because public policy favors the settlement of disputes, and because offers of settlement "lend an aura of guilt and/or liability to the offering party." *Id.*; *State ex rel. Missouri Highway and Transp. Com'n v. Toyota*, 846 S.W.2d 785, 787 (Mo. App. E.D. 1993). Therefore, the evidence runs the risk, "if such offers were admissible, no one would make them, because such behavior could only compromise one's position." *Toyota*, 846 S.W.2d at 787.

██ Like most general rules, however, the rule against admissibility of settlement offers has certain exceptions. *See Ullrich*, 244 S.W.3d at 780; *Daniel v. Indiana Mills & Mfg., Inc.*, 103 S.W.3d 302, 316 (Mo. App. S.D. 2003); *Ellis v. Ellis*, 747 S.W.2d 711, 716 (Mo. App. W.D. 1988). Settlement agreements or offers of settlement may be admitted if there is a clear and cogent reason to do so. *See Daniel*, 103 S.W.3d at 316. Further, this Court has allowed settlement offers to be introduced as evidence when liability was not an issue, and thus the policy supporting the rule did not apply. *Toyota*, 846 S.W.2d at 787.

We find similarly, that in this case, the reasoning and public policy behind the rule do not apply. *See id.*; *see also Daniel*, 103 S.W.3d at 316 (offers of settlement may be admitted for a clear and cogent reason). In fact, it appears the party involved in the settlement, Respondent, actually used the settlement evidence to its advantage for the purpose of proving Respondent's liability. If it is true that settlements "lend an aura of guilt and/or liability to the offering party," we hold that under the special circumstances of this case—where a settling party seeking contribution had to prove its liability to the underlying plaintiffs—the settlement agreement was substantial evidence showing Respondent's liability to Plaintiffs. *See Toyota*, 846 S.W.2d at 787; *see also Lerner*, 486 S.W.3d at 447; *Delacroix*, 407 S.W.3d at 26. In the presence of such substantial evidence, it cannot be said that there was a "complete absence of probative facts" on this point. *See Lerner*, 486 S.W.3d at 447; *Delacroix*, 407 S.W.3d at 26.

### 3. Whether Respondent Presented Evidence that Appellant's Negligence Caused Plaintiffs' Injury

---

**9.** During his testimony, Carl further explained that the settlement amount was $515,000, with the potential to receive another $10,000 based on the outcome of Respondent's claims against Appellant and M Engineering. However, it is unclear from the record whether Plaintiffs received the additional $10,000 and the parties' briefs indicate the final settlement amount was $515,000.

This Court now turns our attention to Appellant's second point, which contends Respondent failed to present "any evidence" that Appellant's alleged negligence caused Plaintiffs' injury. On Respondent's professional negligence claim against Appellant, the trial court submitted Instruction Ten stating:

In [Respondent]'s claim for professional negligence against [Appellant], your verdict must be for [Respondent] if you believe:

First, [Appellant] either:

a) certified that the materials placed under observation, prior to December 2, 2011, met or exceeded the minimum compaction requirements when not all materials place prior to December 2, 2011 had been tested or observed; or

b) certified that the materials placed, prior to December 2, 2011, were tested to meet project specifications when not all materials tested prior to December 2, 2011 met project specifications; or

c) certified the materials placed on the lot prior to December 2, 2011 were suitable for the support of the home when those materials were not suitable to support the home; or

d) failed to tell [Respondent] that not all materials placed on the lot prior to December 2, 2011 had been tested or observed; and

Second, [Appellant], in any one or more of the respects submitted in paragraph First, was thereby negligent, and

Third, such negligence of [Appellant] directly caused or directly contributed to cause damages to [Plaintiffs], [and]

Fourth, [Respondent]'s settlement of the claims of [Plaintiffs] was reasonable.

Appellant does not dispute the evidence presented to meet the requirements of the first and fourth paragraphs of Instruction Ten. Further, Appellant concedes that through the testimony of Respondent's expert, John Shively, Respondent presented evidence sufficient to support a finding of negligence (required by the second paragraph of Instruction Ten) as to two of Appellant's actions. First, Shively, a professional geotechnical engineer with experience in soil movement and slope failure, testified Appellant violated the standard of care applicable to Appellant's profession by allowing the use of high plastic soils in the fill materials when the grading plan prohibited the use of high plastic soils. Second, Shively stated Appellant violated the standard of care applicable to its profession by failing to include a statement in the certification letter that not all fill material had been tested or observed.

Thus, the only issue in this point is whether Respondent presented evidence to support a finding that Appellant's negligence directly caused or directly contributed to cause Plaintiffs' damages (required by the third paragraph of Instruction Ten). At trial, each party presented its own theory as to causation. Respondent asserted the following causal chain: Appellant's negligent actions as defined by Shively allowed construction of Plaintiffs' home to proceed on Lot Eight when the lot was not suitable for construction; Plaintiffs' house was built on soil that did not have the appropriate bearing capacity for the home; the weight of the house caused the soil to move and the slope to fail; and the soil movement and slope failure caused the damage to Plaintiffs' home. In contrast, Appellant argued and presented expert testimony to show the excavation for and installation of the retaining wall caused the soil to move and the slope to fail.

Expert testimony is required to prove professional negligence when the case deals with issues involving matters outside the common knowledge and experi-

ence of laypersons. *Stalcup v. Orthotic & Prosthetic Lab, Inc.*, 989 S.W.2d 654, 657 (Mo. App. E.D. 1999). A plaintiff may make a submissible case of professional negligence if substantial evidence is presented identifying the injury as a natural and probable consequence of the defendant's acts or omissions. *Tompkins v. Kusama*, 822 S.W.2d 463, 465 (Mo. App. E.D. 1991). The burden of proving a causal connection between the defendant's actions and the plaintiff's injury may be met by circumstantial evidence. *Id.* Further, "[i]f the logical conclusion from the evidence is that if certain things had been properly done certain results would not have occurred, and such results *did* occur, the evidence of causation is sufficient." *Id.* (quotations omitted) (emphasis in original). There is sufficient evidence to submit a case to the jury if it may be fairly inferred that the defendant was negligent; but, if the jury can only determine whether the defendant was negligent by relying on surmise and conjecture, the plaintiff has failed to make a submissible case. *Stalcup*, 989 S.W.2d at 657.

Consistent with its verdict, the jury determined Respondent's theory of causation was the correct one. We find Shively's testimony constituted substantial evidence to support this conclusion. Shively testified a slope failure was causing the damage to Plaintiffs' home. Shively indicated the characteristics he observed which led to his opinions included: the back foundation wall of the house had settled and rotated down and towards the back of the house; the floor slab in the basement was draping over the edge of the soil movement; and there were cracks in the concrete walls at the north and south ends of the house. Shively had also observed pictures of the construction of the home that provided additional support to his conclusion.

Moreover, when asked on cross-examination the cause of the slope failure, Shively opined, "I believe that the earth at the interface between the fill and the natural soil has organics, and that the slope against which that fill was placed was inclined and not benched, and that most likely contributed to the failure of this slope." The jury could have fairly inferred or logically concluded from this testimony that improper soil work and compaction, which the jury knew was Appellant's responsibility during construction, caused Plaintiffs' damages. *See id.*; *Tompkins*, 822 S.W.2d at 465. Although Appellant's counsel attempted to impeach Shively on this statement, it was within the province of the jury to accept and give weight to Shively's opinion, and we disregard contrary evidence pursuant to our standard of review. *See Delacroix*, 407 S.W.3d at 26; *see also, e.g.*, *American Family Mut. Ins. v. Coke*, 413 S.W.3d 362, 369 (Mo. App. E.D. 2013) (the jury determines the weight to be given to witnesses' testimony and is free to believe or disbelieve any portion of the testimony).

Furthermore, Respondent presented substantial evidence dispelling Appellant's theory of causation. The following transcribed during Respondent's direct examination of Shively:

[Respondent's Counsel]: Now, what do you think about the retaining wall as a possible cause for the movement of the soil at [Plaintiffs'] property?

[Shively]: I believe the movement began before the retaining wall was constructed. There's damage to the home that's evident in photos that were taken before the construction of the retaining wall started that lead me to think that the failure start-

ed before the retaining wall was constructed.

[Respondent's Counsel]: And if Mike Schwada testified that he was observing cracks in the foundation step down and other areas on the level of the home, that would be consistent—and you saw those before the retaining wall was excavated, that would be consistent with your conclusion there?

[Shively]: Yes.

[Respondent's Counsel]: And if the homeowner was photographing cracks in the foundation and the step down that were actually letting water into the home prior to excavation of the retaining wall, would that be consistent with your opinion?

[Shively]: Yes, it would.

Shively then definitively stated during his testimony that the excavation and construction of the retaining wall was not the cause of the soil movement on Lot Eight. Then, acting upon information that if the retaining wall excavation were the cause of the soil movement and slope failure, the movement should have stopped once construction of the retaining wall was complete, Respondent's counsel further inquired:

[Respondent's Counsel]: .... Under the theory that the retaining wall caused the movement, if you take that theory that Cochran has introduced, would that movement stop when the retaining wall was com-pleted or shortly thereafter?

[Shively]: If you accept that theory as the one that's causing this movement, it should have stopped the movement soon after, within days or weeks after, the completion of the retaining wall. I—I do not believe that's the cause, though.

[Respondent's Counsel]: .... If the retaining wall were a source of the movement, then—or, excavation for the retaining wall were a cause of the movement, you would expect movement to stop once the retaining wall is completed?

. . .

[Shively]: I agree.

[Respondent's Counsel]: Thank you. So, that would be a second point against the theory that the retaining wall is the cause of the movement at [Plaintiffs'] home?

[Shively]: Yes.

[Respondent's Counsel]: And just so I'm clear, under the theory that the retaining wall excavation caused this, would you expect to see movement two years after the retaining wall was complete?

[Shively]: No.

Finally, Dr. Richard Stephenson, Appellant's expert, admitted that if damage, such as the cracks in the basement and foundation of Plaintiffs' home, was appearing before the retaining wall excavation was done, then the excavation likely could

not have caused the slide. Based on all of the preceding testimony along with all the evidence viewed in the light most favorable to the verdict, we find there was substantial evidence from which the jury could reasonably find Appellant's theory of causation—that the retaining wall excavation and construction caused the soil movement and slope failure—was disproven by Shively's testimony. Shively's opinions in favor of one theory of causation and disproving the other theory led to a fair inference as to the cause of Plaintiffs' damages, and took the issue out of mere conjecture and surmise. *See Stalcup*, 989 S.W.2d at 657–58 (similarly finding where plaintiff's expert testified in support of plaintiff's theory of causation and was cross-examined as to and disagreed with defendant's theory). Additionally, all of the evidence cited by Appellant in its argument is contrary evidence, which we disregard pursuant to our standard of review. *See Delacroix,* 407 S.W.3d at 26. In the presence of substantial evidence proving Appellant's negligence directly caused or directly contributed to cause Plaintiffs' damages, we cannot say there was a "complete absence of probative facts" on this point. *See id.*; *Lerner*, 486 S.W.3d at 447.

### 4. Conclusion as to Points One and Two on Appeal

For the foregoing reasons, Respondent presented substantial evidence to establish its own liability to the Plaintiffs. Further, Respondent presented substantial evidence that Appellant's negligence caused Plaintiffs' injury. Therefore, the trial court did not err in denying Appellant's motions for directed verdict and motion for judgment notwithstanding the verdict, because Re-

spondent presented a submissible case for contribution. Appellant's first and second points on appeal are denied.

### B. The Remaining Point on Appeal and Points on Cross–Appeal

Appellant's third and remaining point on appeal and Respondent's two points on cross-appeal each deal with the amount of damages awarded to Respondent. We address Respondent's second point on cross-appeal as it requires the trial court's judgment to be reversed and the cause remanded for a new trial on damages. But because we hold a new trial on damages is required as a result of the second point on cross-appeal, we need not decide the third point on appeal or the first point on cross-appeal.[10]

### 1. Whether the Trial Court Erred in Giving Instruction Eight

In its second point on cross-appeal, Respondent contends the trial court erred in giving Instruction Eight to the jury, because the non-MAI instruction on mitigation of damages was improper and confused the jury. We agree.

### a. Standard of Review and General Law Relating to Respondent's Claim

Whether the jury was properly instructed is a question of law we review de novo. *Hervey v. Missouri Dept. of Corrections,* 379 S.W.3d 156, 159 (Mo. banc 2012). The party asserting instructional error must prove the allegedly improper instruction misdirected, misled, or confused the jury. *SKMDV Holdings, Inc. v. Green Jacobson, P.C.,* 494 S.W.3d 537, 553 (Mo. App. E.D. 2016). We will reverse based on

---

10. *See Braboy v. Federal Express Corp.,* 238 S.W.3d 690, 697 (Mo. App. E.D. 2007); *see also, e.g., Hammett v. Atcheson,* 438 S.W.3d 452, 464 (Mo. App. W.D. 2014) and *Pope v. Pope,* 179 S.W.3d 442, 466 (Mo. App. W.D.

banc 2005) (when an appellate court grants a new trial on the issue of damages, it is unnecessary to consider remaining points on appeal that concern or are interwoven with the amount of damages).

instructional error only if the error resulted in prejudice that materially affected the merits of the case. *Hervey*, 379 S.W.3d at 159.

■ Pursuant to Rule 70.02(b),[11] Missouri Approved Instructions shall be used exclusively whenever an approved instruction is applicable to the case at bar. *Id.*; *SKMDV Holdings, Inc.*, 494 S.W.3d at 553. Where, as here, a challenged jury instruction deviated from the MAI, the appellate court undertakes a multi-step review to determine whether reversal is required. *Syn, Inc. v. Beebe*, 200 S.W.3d 122, 128 (Mo. App. W.D. 2006). First, where the MAI prescribes a specific instruction, the submission of that instruction is mandatory and the failure to use it is presumed prejudicial. *Id.* at 128–29. Second, the proponent of the non-MAI instruction has the burden to demonstrate no prejudice resulted. *Id.* at 129. The presumption of prejudice remains until the proponent makes it "perfectly clear" that no prejudice occurred. *Id.* Finally, we must determine whether prejudice actually occurred, i.e., whether the error materially affected the merits of the case. *See id.*; *Ward v. Kansas City Southern Ry. Co.*, 157 S.W.3d 696, 699 (Mo. App. W.D. 2004); *see also Hervey*, 379 S.W.3d at 159.

### b. MAI Applicable to the Case

■ In this case, Respondent sought contribution from Appellant for all or part of its settlement with Plaintiffs. During the instruction conference, Appellant's counsel submitted Instructions Eight and Nine which allowed the jury to consider the "mitigation of damages" defense.[12] Accord-

ing to Respondent, the applicable MAI for this situation would have been MAI 4.01 as modified by MAI 32.29, which states:

> If you find in favor of **plaintiff**, then you must award **plaintiff** such sum as you believe will fairly and justly compensate **plaintiff** for any damages you believe **plaintiff** sustained as a direct result of the occurrence mentioned in the evidence. If you find that **plaintiff** failed to mitigate damages as submitted in Instruction Number ——, in determining **plaintiff's** total damages you must not include those damages that would not have occurred without such failure.

MAI 4.01 (brackets and non-relevant language omitted) (emphasis added); Note on Use No. 4 to MAI 4.01 (if failure to mitigate damages is submitted, an instruction based on MAI 4.01 must be modified by adding the second sentence); MAI 32.29 (appropriate method of submission of failure to mitigate damages).

### c. Instruction Eight as Submitted

Instead of submitting the MAI instruction discussed above at trial, Appellant's counsel submitted a modified version with one small but significant change. Instruction Eight instructed the jury as follows:

> If you find in favor of **Beris Construction** then you must award **Beris Construction** such sum as you believe will fairly and justly compensate **Beris Construction** for any damages you believe it sustained as a result of the settlement between Beris Construction and Carl and Jessica Eisenmann. If you find that **Carl and Jessica Eisenmann** failed to

---

11. All references to Rules are to Missouri Supreme Court Rules (2016).

12. Mitigation of damages is an affirmative defense which reduces the amount of damages recoverable by an injured party who failed to make some reasonable effort to mini-

mize her damages after the injury occurred. *Hurst v. Kansas City, Missouri School Dist.*, 437 S.W.3d 327, 337 (Mo. App. W.D. 2014); *Burrell ex rel. Schatz v. O'Reilly Automotive, Inc.*, 175 S.W.3d 642, 651 n.10 (Mo. App. S.D. 2005).

mitigate damages as submitted in instruction 9, in determining **Beris Construction's** total damages you must not include those damages that would not have occurred without such failure.

(emphasis added).

The bold language in each of the preceding instructions highlights the modification Appellant proposed and the trial court accepted. While the MAI contemplates a plaintiff's failure to mitigate damages to be held against that plaintiff, Instruction Eight as read to the jury required Plaintiffs' (the Eisenmanns) failure to mitigate damages to be held against Respondent (Beris Construction).

### d. Arguments on Appeal and Analysis of Respondent's Claim

Based on Instruction Eight and its deviation from the MAI, Respondent argues the jury was improperly instructed to consider Plaintiffs' actions—actions Respondent had no control over and about which there is no indication should be attributed to Respondent—in determining whether to reduce Respondent's damages for failure to mitigate. Respondent further asserts that because the jury was already instructed in Instructions Nine and Ten to consider Plaintiffs' failure to mitigate damages in determining whether the settlement was reasonable, Instruction Eight served no purpose but to confuse the jury as evidenced by the verdicts rendered.

Conversely, Appellant contends Instruction Eight was a proper MAI instruction and "[t]he only changes made ... were to insert the correct names[.]" Notably, Appellant acknowledges the discrepancy in who is designated the "plaintiff" in the instruction's second sentence but provides no explanation or authority as to why the modification was proper.

Because Instruction Eight deviated from the MAI, we must perform the multi-part analysis to determine whether we must reverse based on the trial court's submission of Instruction Eight. *See Beebe*, 200 S.W.3d at 128. First, we find the trial court failed to give a mandatory MAI instruction as it accepted Appellant's modified MAI 4.01 including both Plaintiffs' and Respondent's names. *See id.* We presume prejudice resulted to Respondent based upon the trial court's failure to give an applicable MAI instruction. *See id.* at 128–29. Second, the burden is on Appellant to make it "perfectly clear" Respondent was not prejudiced by the improper instruction. *See id.* at 129. Appellant has failed to carry its burden, as the argument portion of Appellant's brief on this point does not even address whether Respondent was prejudiced from Instruction Eight.

With respect to the final requirement of our analysis, we conclude Respondent was prejudiced by Instruction Eight and its submission materially affected the merits of the case. *See id.*; *Ward*, 157 S.W.3d at 699; *see also Hervey*, 379 S.W.3d at 159. We find Instruction Eight confused the jury and misdirected it to consider Plaintiffs' failure to mitigate their damages in determining Respondent's damages. *See SKMDV Holdings, Inc.*, 494 S.W.3d at 553. We further find the juror confusion materially affected the case as it led to inconsistent verdicts. Although neither party objected to the verdicts as being inconsistent and thus could not raise that issue on appeal, we find the verdicts— by awarding Respondent $51,500 (only 10% of its $515,000 settlement with Plaintiffs) but finding Appellant 100% at fault for Respondent's injury—are inconsistent as they cannot reasonably be construed as a definite finding in favor of either party. *See Braboy v. Federal Express Corp.*, 238

S.W.3d 690, 693 (Mo. App. E.D. 2007).[13] The verdicts bear an "inherent contradiction" between the portion of the verdict addressed to apportionment of fault and the portion as to assessment of damages, and because of the inconsistency, they cannot support an entry of judgment. *See id.* at 696.

■■■ We cannot determine precisely how the improper instruction affected the verdicts, because we do "not possess the insight of the Master Clocksmith that would enable a court to peer into the works of the jury's collective mind and say which wheels were turning when the verdict was struck." *See id.* (quotations omitted); *see also Beebe*, 200 S.W.3d at 129. However, we presume the non-MAI instruction was prejudicial, and Appellant has failed to rebut the presumption. *See Hervey*, 379 S.W.3d at 159; *Beebe*, 200 S.W.3d at 128–29. The parties are entitled to the unconditional judgment of the jury, rather than our Court's interpretation of its findings; thus, we must refrain from speculating as to what verdict the jury intended to enter. *Braboy*, 238 S.W.3d at 696.

Therefore, we reverse the trial court's judgment and remand the cause for a new trial on damages. *See Dierker Associates, D.C., P.C. v. Gillis*, 859 S.W.2d 737, 750 (Mo. App. E.D. 1993) (when the issue of liability was fairly decided and the only error is on the issue of damages, we will sustain the jury's finding on liability and remand the cause for a new trial on damages). On remand, if the trial court determines submission of an additional instruction on mitigation of damages is proper, it shall require the instruction to comply with the MAI by instructing the jury to consider Respondent's failure to mitigate, and not Plaintiffs'. Respondent's second point on cross-appeal is granted.

## III. CONCLUSION

For the foregoing reasons, we hold the trial court erred in submitting Instruction Eight to the jury, and in accepting the inconsistent verdicts that resulted. Therefore, the portion of the trial court's judgment relating to damages is reversed, and we remand the cause for further proceedings consistent with this opinion. The trial court's judgment is affirmed in all other respects.

Mary K. Hoff, J., and Lisa P. Page, J., concur.

**13.** Nothing in this opinion should be read to suggest we are abrogating the general rule that if a party fails to object to inconsistent verdicts while the jury is still present, it has waived that claim on appeal. *See, e.g., Douglass v. Safire*, 712 S.W.2d 373, 374 (Mo. banc 1986). We find for purposes of this appeal only, (1) the inconsistency of the verdicts made it unclear as to which party was actually aggrieved by the inconsistent verdicts; (2) the record does not indicate the parties had the opportunity to view the verdicts at trial; and (3) therefore, the parties did not have the opportunity to timely object to the inconsistent verdicts. *See Braboy*, 238 S.W.3d at 693; *Day Advertising Inc. v. Devries and Associates, P.C.*, 217 S.W.3d 362, 368–69, 368 n.5 (Mo. App. W.D. 2007) (discussing *Thorne v. Thorne*, 350 S.W.2d 754, 756, 759 (Mo. 1961) (overruled on other grounds by *Douglass*, 712 S.W.2d at 374)). Further, we conclude determination of this issue appropriately addresses the parties' grievances with the verdicts.